### In re INSULL UTILITY INVESTMENTS, Inc.

No. 49943.

District Court, N. D. Illinois, E. D.
Dec. 22, 1933.

654

White & Hawxhurst and Jacobson, Merrick, Nierman & Silbert, all of Chicago, Ill., for petitioning creditors.

Rosenthal, Hamill & Wormser, of Chicago, Ill., for trustee.

William L. Latimer, of Chicago, Ill., for bankrupt.

Samuel A. & Leonard B. Ettelson, of Chicago, Ill., for Amy B. Ettelson.

Cassels, Potter & Bentley, of Chicago, Ill., and Allen & Dalbey, of Danville, Ill., for Calvin Fentress.

EVANS, Circuit Judge.

The questions which are here presented grow out of the petition of Calvin Fentress for compensation for services rendered as receiver and compensation to Allen & Dalbey and Cassels, Potter & Bentley for legal services rendered.

Fentress was appointed receiver of the Insull Utility Investments, Inc. upon motion of plaintiff Cherry, who filed a suit in the District Court for the Northern District of Illinois against said company. After his appointment as receiver in the main suit brought in the Northern District of Illinois, he was appointed ancillary receiver in New York and was later appointed receiver in the bankruptcy proceedings instituted in the Northern District of Illinois against the same company. He asks for compensation for himself and for the attorneys who acted as his counsel. Although his request for compensation is for services rendered by him and his attorneys in the bankruptcy matter, the court is required, under the rule laid down in Gross v. Irving Trust Co., 289 U. S. 342, 53 S. Ct. 605, 77 L. Ed. 1243, to finally pass upon the reasonableness of the compensation allowed in the equity receivership matters and, to do so, must determine the *value* and the *necessity* of the services rendered by the receiver and his attorneys.

One Ettelson, an unsecured creditor, objects to the allowance of any fees either to the receiver or his attorneys, Allen & Dalbey, on the ground that the suits were collusively instituted to secure, through the practice of fraud on the court, the appointment of receiver and counsel who would not, and could not, adequately represent those not parties to the fraudulent agreement. No objection is made to the allowance of fees to Cassels, Potter & Bentley, who were employed some weeks after the receiver was appointed, and who are admittedly outside the scope of the alleged collusive agreement; nor is there any objection to the reasonableness of the sums sought, if the court be of the opinion that fees should be allowed.

All of the receiverships above mentioned have been terminated, and the receiver Fentress has turned over all of the assets, which he received or collected as receiver, to his successor, the trustee of the bankrupt estate of Insull Utility Investments, Inc.

The application for the appointment of a receiver of Insull Utility Investments, Inc. was made April 16, 1932. The receiver Fentress was appointed April 16, 1932. He was named ancillary receiver in New York on the 19th day of May, 1932. He was named receiver in the matter of the bankrupt estate of Insull Utility Investments, Inc. on the 22nd day of September, 1932. The trustee of the bankrupt estate was appointed March 9, 1933.

There are two specific questions which the court must determine: (a) Was there such collusion in the institution of the original suit

wherein Fentress was appointed receiver, or in the ancillary proceedings wherein he was appointed ancillary receiver, or in the proceedings leading to his appointment as receiver in the bankruptcy matter, as to justify the refusal of any compensation to him and to his attorneys? (b) If not, what sum would compensate him for work performed and what sum should be allowed his counsel for services rendered?

In order that we may apply the rule, it is necessary first to ascertain what constitutes collusion. It has been frequently defined by various courts, including the Supreme Court.

In Dickerman v. Northern Trust Co., 176 U. S. 181, 20 S. Ct. 311, 314, 44 L. Ed. 423, the court said:

"We have no doubt that this judgment was collusive in the sense that it was obtained by the plaintiff and consented to by the defendant company for the purpose of giving the trustees a legal excuse for declaring the principal and interest of the mortgage to be due, and to give authority for a foreclosure. But this did not constitute collusion in the sense of the law, nor does it meet the exigencies of the petitioners' case. Collusion is defined by Bouvier as 'an agreement between two or more persons to defraud a person of his rights by the forms of law, or, to obtain an object forbidden by law,' and in similar terms by other legal dictionarians. It implies the existence of fraud of some kind, the employment of fraudulent means, or lawful means for the accomplishment of an unlawful purpose; but if the action be founded upon a just judgment, and be conducted according to the forms of law and with a due regard to the rights of parties, it is no defence that the plaintiff may have had some ulterior object in view beyond the recovery of a judgment, so long as such object was not an unlawful one."

In Re Metropolitan Ry. Receivership, 208 U. S. 90, 28 S. Ct. 219, 224, 52 L. Ed. 403, the court said:

"It is asserted also, that there was collusion between the complainants and the street railway companies, on account of which the court had no jurisdiction to proceed * * *. Whether the suit involved a substantial controversy we have already discussed, and the only question which is left under that act is as to collusion.

"In this case we can find no evidence of collusion, and the Circuit Court found there was none. It does appear that the parties to the suit desired that the administration of the railway affairs should be taken in hand by the Circuit Court of the United States, and to that end, when the suit was brought, the defendant admitted the averments in the bill and united in the request for the appointment of receivers. This fact is stated by the Circuit Judge; but there is no claim made that the averments in the bill were untrue, or that the debts, named in the bill as owing to the complainants, did not in fact exist; nor is there any question made as to the citizenship of the complainants, and there is not the slightest evidence of any fraud practiced for the purpose of thereby creating a case to give jurisdiction to the Federal court. That the parties preferred to take the subject matter of the litigation into the Federal courts, instead of proceeding in one of the courts of the State, is not wrongful. So long as no improper act was done by which the jurisdiction of the Federal court attached, the motive for bringing the suit there is unimportant. Dickerman v. Northern Trust Co., 176 U. S. 181, 190; South Dakota v. North Carolina, 192 U. S. 286, 311; Blair v. City of Chicago, 201 U. S. 400, 448; Smithers v. Smith, 204 U. S. 632, 644."

Other decisions dealing with the same subject are to be found in: Harkin v. Brundage, 276 U. S. 36, 48 S. Ct. 268, 72 L. Ed. 457; Black & White Taxicab Co. v. Brown & Yellow Co., 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426; Street v. Maryland Central Ry. Co. (C. C.) 58 F. 47; Burton v. R. G. Peters Salt & Lumber Co. (C. C.) 190 F. 262; May Hosiery Mills, Inc., v. F. & W. Grand 5–10–25 Cent Stores, Inc. (D. C.) 59 F.(2d) 218; Williams v. Nottawa, 104 U. S. 209, 26 L. Ed. 719; Lake County Commissioners v. Dudley, 173 U. S. 243, 19 S. Ct. 398, 43 L. Ed. 684.

A general statement of what constitutes collusion appears in Corpus Juris, volume 11, page 1220, section 2, from which the following quotation is taken:

"Collusion in judicial proceedings is a secret agreement between two persons that the one should institute a suit against the other, in order to obtain the decision of a judicial tribunal for some sinister purpose, and appears to be of two kinds: (1) When the facts put forward as the foundation of the sentence of the court do not exist. (2) When they exist, but have been corruptly preconcerted for the express purpose of obtaining the sentence. In either case the judgment obtained by such collusion is a nullity. The term is nearly allied to covin, and has been judicially defined as a secret agreement between two or more persons, whose interests are apparently conflicting, to make use of the forms and pro-

ceedings of law in order to defraud a third person, or to obtain that which justice would not give them, by deceiving a court or its officers; a secret understanding between two parties who plead or proceed fraudulently against each other to the prejudice of a third person; an agreement between two or more persons unlawfully to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law * * * or where two persons apparently in a hostile position, or having conflicting interests, by arrangement do some act in order to injure a third person, or to deceive a court, or by keeping back evidence of what would be a good answer, or by agreeing to set up a false case; a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third person of his right; an agreement to obtain an object forbidden by law; a concerted or agreed purpose to commit a fraud or to accomplish a wrong; fraud."

A few illustrations of collusion which clearly fall within the condemnation of the courts may be helpfully stated.

A sues B on a debt when there is no debt, and B by his answer admits the indebtedness pursuant to an agreement between A and B to defraud other creditors of B. Here we have a clear case of collusion. Again, A is indebted to B in a sum less than $3,000 and through agreement with B raises the sum to an amount in excess of $3,000 so that the jurisdiction of the Federal court may be invoked; and B, in his answer, admits indebtedness in excess of $3,000. Here we have another illustration of fraud which clearly establishes collusion.

The instant case, however, may readily be distinguished from the above illustrations.

█ The inquiry may be stated thus: In a receivership proceeding, may the defendant cause a suit to be brought against it by a bona fide creditor and, by answering and truthfully admitting the allegations of the complaint, join in the recommendation of a certain receiver? Obviously, the answer must be Yes. No collusion in this statement of facts is disclosed, for as stated in Dickerman v. Northern Trust Co., 176 U. S. 181, 190, 20 S. Ct. 311,.314, 44 L. Ed. 423:

"* * * It (collusion) implies the existence of fraud of some kind, the employment of fraudulent means, or lawful means for the accomplishment of an unlawful purpose * * *."

█ But, if the receivership proceedings are brought about by the defendant (that is, by the defendant's inducing a friendly creditor to bring suit against it) for the purpose of securing a receiver who will be friendly to those who have previously operated the company's affairs and have been guilty of peculation or other wrongdoing, and in the motion for the receiver, the plaintiff, without informing the court who it was that induced him to bring the suit and make the nomination, recommends as the receiver, the party selected by the defendant company, and the defendant, also remaining silent on the conflict of interest, joins in the recommendation, then we have, so far as the appointment of a receiver is concerned, collusion. Likewise, if B, an insolvent company that has preferred X, a creditor, causes a suit to be instituted against it by A, one of its "friendly" creditors, and X and B, for the purpose of preventing the receiver from vigorously prosecuting either the managing officers or those who hold preferred or secured claims subject to be set aside, induce A to recommend to the court the name of one chosen by X and B, and A fails to inform the court by whom his nominee was chosen and fails to inform the court of the° adverse character of their interests, then, too, we have a case of collusion.

█ No other rule could safely be adopted or would adequately protect a court from the imposition of fraud upon it by parties interested in protecting themselves rather than the involved company or its unsecured creditors. The importance of such a rule of practice as here announced can hardly be overestimated. . The court should, when appointing receivers, pay heed to the recommendations of those vitally interested. Receiverships are not perquisites or patronage of a court. They are not favors to be passed to friends. The request of those who have invested their money in the enterprise must be the persuasive voice in the determination of the appointee. True, the court has a veto power which should be freely exercised, but only when convinced that another can serve better than the recommended party. It is because of the importance of the recommendation thus made that the court is entitled to candor, good faith, and a full disclosure of the interests of those who bring the suit and of those making the recommendation.

█ Because the equity proceeding is instituted in order that the affairs of the company may be temporarily operated by a receiver, *and operation of such affairs by the receiver*

*is the essence of such suit,* we must look to the proceedings preliminary to the receiver's appointment to ascertain whether there was collusion. In the illustrations cited above, the establishment of a fraudulent or an enlarged claim constitutes the collusion. In the case under consideration the inquiry must be directed to interested parties' activities, and to the effect of such activities, leading up to the appointment of the receiver.

The adversary relation between plaintiff and defendant must exist at all times. It does not, and can not, exist where the defendant picks its adversary, prepares a complaint for it, and said adversary appears in court and, *as an adversary,* nominates one selected by the defendant company, or by a creditor whose position is hostile to the position of the receiver to be appointed. That the line of demarcation may be clearly drawn and the distinction between this and other suits which have been sustained by the courts may be emphasized, it may not be inappropriate to more definitely distinguish between proper and improper practices. This, I shall endeavor to do.

An involved company may explain its embarrassment to a creditor. It may select one creditor over others. It may urge a creditor to bring a suit and request the appointment of a receiver. It may furnish to said creditor the facts which show the advisability and necessity of the appointment of a receiver. It may recommend for receiver the name of one whom it prefers. All these things it may lawfully and properly do.

But, it may not alone, or in conjunction with secured creditors whose security must, or may thereafter be, attacked by the receiver, induce said creditor to bring the suit *and recommend as its own naming,* a receiver selected by the company and said secured creditors. Nor can an executive of the company interested in protecting his own action, while directing the affairs of the company, assume to speak for the company when it comes to nominating a receiver who, in the performance of his duties, may be required to bring suit against said executive officer. It is not the bringing of a suit by a friendly creditor that is objectionable, nor is consent to the entry of a decree, evidence of collusion. It is only when the suit is one for the appointment of a receiver and the nominee proposed for receiver is urged by one who, assuming to speak as a creditor, voices the recommendation of those whose interests are adverse to that of the company and its creditors, that fraud appears.

The word "collusion" is somewhat of a misnomer. The theory upon which the foregoing rule is based, must be traceable to certain maxims of equity which find elaboration in the case of Keystone Driller Co. v. General Excavator Co., 290 U. S. 240, 54 S. Ct. 146, 147, 78 L. Ed. 293, decided December 4, 1933, by the Supreme Court, Justice Butler writing the opinion. The court was considering the effect of a failure to disclose certain material facts to the court.

The court said:

"Plaintiff contends that the maxim does not apply unless the wrongful conduct is directly connected with and material to the matter in litigation, and that, where more than one cause is joined in a bill and plaintiff is shown to have come with unclean hands in respect of only one of them, the others will not be dismissed.

"The meaning and proper application of the maxim are to be considered. As authoritatively expounded, the words and the reasons upon which it rests extend to the party seeking relief in equity. 'It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands. He must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court.' Story's Equity Jurisprudence (14th Ed.) § 98. The governing principle is 'that whenever a party who, as *actor,* seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' Pomeroy, Equity Jurisprudence (4th Ed.) § 397. This court has declared: 'It is a principle in chancery, that he who asks relief must have acted in good faith. The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abetter of iniquity.' Bein v. Heath, 6 How. 228, 247, 12 L. Ed. 416. And again: 'A court of equity acts only when and as conscience commands; and if the conduct of the plaintiff be offensive to the dic-

tates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.' Deweese v. Reinhard, 165 U. S. 386, 390, 17 S. Ct. 340, 341, 41 L. Ed. 757.

"But courts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. Story, Id., § 100. Pomeroy, Id., § 399. They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice. They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."

It is urged that the practice followed in the instant case has the sanction of like practices in most large receivership matters here and elsewhere. If so, the solution is a simple one. Cease the practice.

As the rule of conduct has been determined, it becomes necessary to consider the evidence to ascertain whether the parties seeking the appointment of a receiver kept within, or stepped outside, the rule of proper conduct.

█ A brief review of the situation that existed when the receiver was appointed is herewith attempted. It is quite impossible to separate the application for the appointment of a receiver in the Insull Utility Investments, Inc., from like applications in Middle West and Corporation Securities Companies. Three companies were organized and promoted by the so-called Insull interests. They all revolved about the activities of one Samuel Insull, Sr. One company, the Middle West, was a holding company, and the other two are investment trusts. Neither the genus, the holding company, nor the specie, the investment trust, can find but little justification for legal existence. Their unfortunate presence in our midst is due to the desire of states to secure revenue and the race of the states has been one of laxity and not one of diligence. Liggett v. Lee, 288 U. S. 559, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699.

As it was conducted in 1929, the investment trust was nothing but a glorified gambling institution. Hardly had Insull Utility Investments, Inc., sailed forth on the sea of speculation carrying the Insull flag than it was attacked by the pirate ship Eaton, from Cleveland. In 1929, piracy was not outlawed, nor, it seems, was there any closed season on the operations of those engaged in this popular pastime on the sea of high finance. When the smoke of this conflict disappeared and the damage was appraised, it was found that the assets of the Insull Utility Investments, Inc., were sadly depleted. In the succeeding months the company borrowed vast and ever vaster sums of money from banks, to secure which it hypothecated most of its remaining assets.

On April 16, 1932, when the receivers were appointed, it had outstanding unsecured debentures of Series B, aggregating $60,000,000, and it had another issue of debentures, known as Series A, aggregating $6,000,000. It owed banks in the sum of $42,085,020, all secured. Its capital stock was represented by 60,000 shares of Prior Preferred Stock without par value; 40,000 shares of Preferred Stock, 1st Series without par value; 450,000 shares of Preferred Stock 2nd Series; and 3,636,622 shares of Common Stock without par value. Its unliened assets aggregated approximately $1,500,000. Mr. Insull made one last, final effort to borrow money with which to pay interest on the debenture notes, but failed. The company was therefore unable to pay the interest about to become due upon its debenture notes. In short, its financial condition was desperate, beyond all hope of rehabilitation. It was hopelessly and irretrievably insolvent.

Each debenture note contained the following provision:

"The Company hereby covenants and agrees with the holder hereof that so long as this debenture shall be outstanding and provision for the payment thereof shall not have been made, it will not mortgage or pledge any of its property unless the instrument creating such mortgage or pledge shall provide that this debenture shall be secured thereby equally and ratably with all other obligations issued or to be issued thereunder, except that the Company without so securing this debenture (a) may at any time mortgage or pledge any of its property for the purpose of securing loans to the Company contracted in the usual course of business for periods not exceeding one year, and (b) may, in order to secure the purchase price or part thereof of

any property which it may hereafter acquire, mortgage or pledge any or all of such acquired property."

It was in the face of this situation that Samuel Insull, Sr. invited representatives of banks, who held the company's notes secured by the company's assets, to meet and discuss with him the question of a receivership, which discussion included the nomination of receivers.

Mr. Insull's attorneys, presumably upon his instructions, drew bills of complaint for the appointment of a receiver for at least two, if not three, of the aforenamed companies. At the second meeting held in Insull's office, that gentleman refused to accept Mr. Calvin Fentress as sole receiver of Insull Utility Investments, Inc.

Secured creditors suggested the name of Mr. Calvin Fentress. Mr. Insull insisted upon naming one of his attorneys as coreceiver. An agreement was then reached and carried out whereby the banks named one receiver, Mr. Insull named the others. The plaintiff who brought the suit represented to the court that the two chosen individuals were the choice of himself and other creditors.

The banks insist that they were activated only by the best of motives in suggesting the name of Calvin Fentress. The subsequent conduct of Mr. Fentress justified the words of commendation of him spoken, but the situation which existed in the affairs of the company made the action of those who sponsored him, collusive.

The company had assets of $1,500,000 with which to meet the unsecured debenture obligations of $66,000,000, as well as other debts which would, of course, leave nothing for the stockholders. The debenture holders had, however, a possible claim against the banks because of the alleged unauthorized action of Mr. Insull in hypothecating the assets which were the only security back of the debenture notes. I do not mean to say that the cause of action in favor of the debenture holders against the secured creditors is a good one. That question is not before me, and I have not been enlightened as to the facts. However, there was the cause of action, and it constituted the one and only hope of the debenture holders.

In such a situation the query, Who represented the debenture holders? becomes an insistent and a most pertinent one.

The secured creditors were not interested in the receiver, for their claims were secured by the hypothecated securities of the company. Mr. Insull, the other nominator of the receivers, asserted an interest because he and his family owned stock in the company. The stock was worthless however, even if the assets of the bank were returned to the company. Only a small fraction of the indebtedness could be paid, which left absolutely nothing for the stockholders. Mr. Insull (and I refer at all times to Insull, Sr. and not Insull, Jr.) was, however, interested in perpetuating his control and perhaps avoiding liability for unauthorized official and other action. The secured creditors, likewise, might have been interested in obtaining the appointment of receivers who would not too aggressively or ably prosecute the company's suit to recover the hypothecated assets. These two interests, thus uniting upon receivers, sought a creditor who signed the bill of complaint prepared for him, and his representative presented it to the court with a statement that the principal creditors desired the appointment of Mr. Fentress and Mr. Cooke.

Upon this showing, and bearing in mind that the suit was one for the appointment of a receiver, a finding that the suit was collusively brought is unavoidable.

But the question of Mr. Fentress' compensation, notwithstanding the collusive agreement, remains for determination. Moreover, his appointment in the ancillary suit was not objectionable, unless such ancillary proceedings are subject to the same attack as the main suit. There can, however, be little question but that his appointment as receiver in the bankruptcy proceedings was on the judge's own initiative and uninfluenced by any outside recommendation. The testimony on the trial supplemented by the voluminous record before me confirm Judge Lindley's judgment. Calvin Fentress, as receiver, earned and deserved the appointment of receiver in the bankruptcy proceedings provided it was a proper case for the appointment of a receiver. His conduct throughout the receivership proceedings was that of an independent and aggressive officer of the court, who merited the court's approval. No sooner was he appointed than he sought and secured an order enjoining the creditor banks in New York from selling the securities which they held. When the order was vacated on appeal, he was appointed ancillary receiver in New York and again stayed the hand of the secured creditor banks in New York by legal action. He promptly demanded and secured the consent of the creditor banks in Chicago, who held the securities hypothecated with them, to hold such securities and not to offer them for sale without 5 days notice to him,

and otherwise fully protected the assets of the company for which he was acting as receiver. He was vigilant, honest, and industrious.

His coreceiver, Mr. Cooke, resigned shortly after he was appointed and there is no question involved concerning his action or his compensation.

Mr. Insull, who, as a part of this general scheme, was appointed one of the receivers of Middle West Utilities Company, was, a few weeks after his appointment and immediately upon the discovery of irregularity in his conduct, removed as receiver by Judge Lindley. Judge Lindley's prompt action in dismissing him immediately upon the discovery of grounds therefor, is to be commended.

During the entire period from April 16, 1932, when Fentress was appointed, until he turned over the assets to the trustee in bankruptcy, no creditor, debenture holder, or anyone else objected to his appointment as a receiver.

Whether the compensation of a receiver appointed under the circumstances here shown should be denied in toto (where creditors do not object and the receiver renders valuable and honest service) or whether such compensation should be charged to the plaintiff who brought the suit, need not be decided in view of my determination of the fair value of the receiver's services *necessarily* rendered.

### Fees.

■ While the objecting creditor has not contested the amount of the fees, if the right to recover exists at all, the court is not so readily absolved from responsibility. The court must determine the reasonableness of the charges, even though no objections are made by any security holder.

Before taking up the specific facts in the instant case, it may not be inappropriate for me to give my conception of a receiver's duties, without an understanding of which it is difficult, if not impossible, to appraise the value of his services or the amount of compensation which should be awarded him.

The position of receiver is one which calls for the performance of responsible and onerous duties, the rendition of which may, as in this case, result in criticism. At times the positions of creditors and stockholders of an involved company are antagonistic and the receiver must act honestly, fairly, impartially and without fear of criticism or attack. He is an officer of the court and often referred to as an arm of the court. His selection evidences confidence in him by those who nominate him and by the court that appoints him. His qualifications should be those that invite trust and confidence. Because of his integrity and experience and his record of achievement in other fields of activity, he is selected. The position is therefore one of honor. And this, too, must have a large bearing in determining the amount of his compensation. By honor, I do not refer to those superficial and artificial indicia of office or position which express themselves in titles, in robes, in ranks, in preferred positions at social functions, etc. Honor as here used has reference to the esteem which is paid to worth—to men who have learned and fully appreciate the meaning of the word "responsibility." I, of course, use the word "honor" in this sense when I refer to the position of receiver as one of trust and honor.

The position of receiver being one of honor and trust, an officer of the court, the incumbent must recognize that a substantial part of his compensation must be found in the opportunity to serve. He has, in other words, joined the ranks of those who are public servants, whose compensation never has been and never will be as large as of those engaged in private employment. His compensation must in some ways be compared to the salary of the judge who was sitting on the bench when the appointment was made. An inquiry into the compensation of the United States District Attorney and the Postmaster is appropriate. The salary of the Chief Justice of the United States Supreme Court may well be viewed as the maximum which should be allowed. These are not the sole tests, but it must be recognized that receivers in the Federal courts are in their nature public officers and their compensation must be determined in the light of such facts. Unless the courts can secure the services of such men and unless courts insist upon the selection of such receivers, the task of meeting a situation such as has confronted them since 1929 may well be surrendered to other bodies.

Unless the appointee looks upon the appointment as an opportunity for real service, he will not be reconciled to this compensation. But until and unless such a conception of his position is fully established, it seems to the writer that the administration of embarrassed or bankrupt companies in the Federal courts will never be satisfactory.

■ The Supreme Court in Newton v. Consolidated Gas Co., 259 U. S. 101, 105, 42 S. Ct. 438, 439, 66 L. Ed. 844, has announced

standards by which compensation of officers of the court may well be measured. It said:

"The value of a capable master's services cannot be determined with mathematical accuracy; and estimates will vary, of course, according to the standard adopted. He occupies a position of honor, responsibility, and trust; the court looks to him to execute its decrees thoroughly, accurately, impartially, and in full response to the confidence extended; he should be adequately remunerated for actual work done, time employed, and the responsibility assumed. His compensation should be liberal, but not exorbitant. The rights of those who ultimately pay must be carefully protected; and while salaries prescribed by law for judicial officers performing similar duties are valuable guides, a higher rate of compensation is generally necessary in order to secure ability and experience in an exacting and temporary employment which often seriously interferes with other undertakings. See Finance Committee of Pennsylvania v. Warren, 82 F. 525, 527, 27 C. C. A. 472; Middleton v. Bankers' & Merchants' Tel. Co. (C. C.) 32 F. 524, 525.

"Having regard to these general principles and the special value of knowledge possessed by the trial court, much weight must be given to its opinion. Ordinarily we may not substitute our judgment for its deliberate conclusions, nor interfere with the exercise of its discretion. But when that court falls into error which amounts to abuse of discretion and the cause comes here by proper proceedings, appropriate relief must be granted.

"Notwithstanding protracted, painstaking, and for the most part excellent services rendered by the master and the large amounts involved in these causes, after viewing the records and considering the circumstances disclosed, we cannot doubt that the allowances are much too large—certainly twice and three times what they should be. If the time devoted to the entire service—282 days—be accepted as equivalent to one year, the total allowance is 15 times the salary of the trial judge and 8 times that received by justices of this court. It may be compared to the compensation of the mayor of New York City, $15,000, the salaries of the Governor and members of the Court of Appeals of New York, $10,000, and the $17,500 paid to judges of the Supreme Court in the City of New York. Although none of these can be taken as a rigid standard, they are to be considered when it becomes necessary to determine what shall be paid to an attorney called to assist the court. His duties are not more onerous or responsible than those often performed by judges."

Another important factor in the compensation of the receiver is the time devoted to the work and the character of the work performed. Does such appointment exclude the appointee from carrying on other work? Is the appointee thus named, a receiver in other suits? Are the appointees engaged in business, and does the appointment terminate such participation? Another matter—Does the performance of the receivership call for special knowledge and special training? If so, does the receiver who is appointed qualify? A single illustration will suffice. A president of a railroad has reached his position after forty years of service. He has devoted his entire life and all his time to the transportation business. His road goes into receivership, and he is named receiver. He continues to devote his entire time, and his experience is as valuable as a receiver as it was as president of the railroad. Under such circumstances, the court must of course consider the compensation which the appointee received as president of the railroad. The same applies to the receiver of any other utility. If the appointee be an engineer or an operator, whose years of experience especially qualify him and he has technical training supplementing such experience, and he gives all of his time to the task, he should be paid more than one who, though entitled to the confidence of the court, is not equally qualified to render the service for which the technical experience of the engineer qualifies him. Nor should one award the same compensation to an outsider who does not devote all of his time to the management and operation of the company.

Moreover, the success of the receivership can not be entirely overlooked in determining the fees which should be allowed, although at times the importance of this factor is often greatly exaggerated, and at times, though rarely, it has been underestimated.

▇▇ And finally, in determining compensation, it must be kept in mind that 1933 is not 1929. The wages and salaries of all kinds were much lower in 1932 than in the twenties. The difference must be reflected in the compensation of receivers and their counsel, as it is in other fields.

▇▇ Mr. Fentress as receiver in equity charged and received $12,500. As receiver in the ancillary proceedings, his bill is $7,500. As receiver in bankruptcy, he asks $10,000.

In all three proceedings he served for a period of eleven months.

Mr. Fentress devoted eleven months to all three services. He has received $12,500. He has not severed his connection with the business house of which he was an officer. Considering what has been said, I am of the opinion that Mr. Fentress has received all the compensation the court should allow him. In other words, I fix the value of his services at $12,500 in this case. This sum he has received. No further allowance will be made.

 In view of what has already been stated on the subject of receivers' fees, little need be said of lawyers' fees.

Receiverships, as far as fees are concerned, are of two kinds. One class calls for administrative work such as the operation of a manufacturing plant or the running of a public utility. Here the receiver renders the greater service. In the other class of cases, the problems are legal in nature and demand the rendition of legal services in following assets which have disappeared or which have been transferred, etc. In the latter class, the attorneys render the more important service.

The legal services rendered in this case, while entirely worthy and evidencing ability, were devoted to maintaining the status quo rather than to the recovery of the securities hypothecated with the secured creditors. *No increase in the assets of the estate resulted from the services of counsel or receiver.* This fact is most significant. Compensation should be generous when the attorneys, through their efforts, *create* the estate to be administered. When their services are rendered without hope of compensation unless they are successful in creating the estate to be administered, their compensation should be still larger. For under such circumstances the attorneys work on a contingent or a nearly contingent basis.

Each firm has filed itemized statements setting forth the time devoted to the case. Each firm has received $12,500. The firm of Cassels, Potter & Bentley ask for a further allowance of $5,000; while Allen & Dalbey pray an allowance of $9,000.

Under numerous authorities there was no ground for the appointment of a receiver in the bankruptcy matter. In re E. H. Walsh, Inc. (C. C. A.) 295 F. 504; In re Gochenour (C. C. A.) 64 F.(2d) 500; Ingram v. Ingram Dart Lighterage Co. (D. C.) 226 F. 58; In re Federal Mail Co. (D. C.) 233 F. 691; Collier, Bankruptcy, Supplement, p. 23. The rule seems to be that receivers in bankruptcy matters will not ordinarily be appointed where there are duly appointed receivers in possession of the property. The statute itself (Bankr. Act § 2, subd. 3, 11 USCA § 11 (3), provides limitations on the powers of the court to make appointments. It provides for the appointment of "receivers or marshals, * * * in case the courts shall find it absolutely necessary, for the preservation of estates, to take charge of the property of bankrupts * * *."

Likewise, the duties of the receiver and his attorneys are limited—quite different from those of a receiver in the ordinary equity suit or from those of a trustee subsequently named in the bankruptcy matter. In re Marcuse & Co. (C. C. A.) 11 F.(2d) 513.

The bankrupt estate for which the receiver was appointed and for whom the attorneys rendered their services consisted of stocks, notes, and bonds of various public utilities. These assets required little or any service, legal or otherwise, to protect them *pending the election of the trustee in bankruptcy.* They were not perishable commodities. It is inconceivable that any considerable amount of time was *necessarily devoted* to the protection or preservation of these securities by counsel or receiver.

Under all the circumstances the court finds that the allowance of $12,500 in each case is sufficient. The court concludes that further allowance in either case would be unjustifiable.

The court finds there was no collusion in the naming of counsel. In fact, the firm of Cassels, Potter & Bentley was not appointed until some weeks after the receivers were named. The objector Ettelson, in open court, disavowed all intention of involving this firm in the collusion charges.

Expenses and disbursements have been incurred by counsel as well as receiver. No objection is made to either the amount or to any item. They will be allowed.

An order will be entered refusing further allowance of fees to receiver and refusing further allowance to counsel. The same order will provide for the payment of said expenses and disbursements.