## LINCOLN PRINTING CO. v. MIDDLE WEST UTILITIES CO.

## POLLAK v. McCULLOCH.

### No. 5262.

Circuit Court of Appeals, Seventh Circuit. Jan. 2, 1935.

Rehearing Denied Feb. 15, 1935.

---

Samuel A. Ettelson, of Chicago, Ill., for appellant.

Isaac H. Mayer, Carl Meyer, and Frederic Burnham, Herbert A. Friedlich, all of Chicago, Ill., for Continental Illinois Nat. Bank & Trust Co. of Chicago.

Albert L. Hopkins, Donald J. De Wolfe, and Anderson A. Owen, all of Chicago, Ill., for First Nat. Bank of Chicago.

Thurlow G. Essington and George B. McKibbin, both of Chicago, Ill., for Lincoln Printing Co.

Bruce Johnstone, Guy M. Peters, and William Burry, Jr., all of Chicago, Ill., for McCulloch.

James G. Condon and William .A. Ryan, both of Chicago, Ill., for Hurley Estate.

Donald F. McPherson, M. Ogden West, and Martin Taylor, all of Chicago, Ill., for preferred stockholders' committee.

Joseph B. Fleming and Robert N. Golding,. both of Chicago, Ill., for noteholders' committee.

Before SPARKS, FITZHENRY, and PAGE, Circuit Judges.

SPARKS, Circuit Judge.

This is an appeal from an interlocutory decree of the District Court denying and dismissing appellant Pollak's intervening petition to discharge equity receivers theretofore appointed for the Middle West Utilities Company, hereafter referred to as Middle West, and certain of their counsel; to dismiss the bill in equity of the Lincoln Printing Company under which the receivers were appointed; to set aside the equity proceedings in said cause, and to wind up the receivership. The basis for the demands in Pollak's petition was the alleged collusion in the appointment of the receivers and the institution of the proceedings for that purpose.

On April 14, 1932, the Lincoln Printing Company filed its bill of complaint in the District Court for the appointment of equity receivers for the Middle West, whereupon that company filed its answer of admission and consent, and on the next day, Samuel Insull, Edward N. Hurley, and Charles A. McCulloch, at the suggestion and by agreement of the parties, were appointed by the court as such receivers. About the same time Calvin Fentress, in a similar consent proceed-

ing, was appointed by the District Court as equity receiver for Insull Utility Investments, Inc. Subsequently that company was adjudicated a bankrupt, and Fentress was appointed as receiver in bankruptcy at which time he, as receiver in bankruptcy, received from himself, as equity receiver, the entire corpus of the estate, holding it until the appointment of a trustee in bankruptcy. Later, on petition for fees for services for himself and counsel, objection was made by a stockholder of that company on the ground that there was collusion in his appointment and in the selection of his counsel. That issue was tried in the District Court before Judge Evans, whose opinion appears in 6 F. Supp. 653. Judge Lindley, who had appointed the receivers for the Middle West, regarded the language of Judge Evans' opinion as an implication of fraud upon the court in procuring the appointment of the receivers for Middle West. He thereupon, sua sponte, initiated proceedings in chancery for a complete investigation and final adjudication of that question.

It was in this proceeding that appellant, on January 11, 1934, petitioned and was permitted to intervene. In the meantime, Samuel Insull had resigned at the request both of the court and of his co-receivers, and Mr. Hurley had died. Receiver McCulloch filed a petition with the court asking for a full investigation of the charges.

In Pollak's intervening petition it was alleged that he was the owner of 2,200 shares of common stock of the Middle West; that the receivership proceedings had been fraudulently instituted and were a fraud and imposition upon the court; that prior to the appointments certain secret meetings had been held, attended by Samuel Insull, his personal counsel, and executives of certain creditor banks, for the purpose of formulating a specific plan and procedure for placing Middle West and certain other so-called Insull Corporations in receivership; that at those meetings Insull, Hurley, and McCulloch were collusively selected to be suggested as receivers, and two law firms to be their counsel; that no debenture holders, unsecured creditors or stockholders were represented, and that the meetings were held, and the selection of nominees made, solely in the interest of Insull and the secured bank creditors, who were interested in protecting for themselves certain collateral placed by Insull with them, to secure loans procured by him in his prior unlawful management of the corporation. The petition also charged that full and fair disclosure was not made to the court of the meetings, or of what there occurred as to how or by whom the recommendations had been agreed upon; that about the same time a petition in bankruptcy, which was still pending, was filed in the same court against the company; that the selection of receivers and solicitors was in violation of the practice approved by the Supreme Court, and that the receivers and their attorneys and solicitors were disqualified and their appointments illegal and void.

The relief prayed was in the alternative:

That the bill of complaint and all proceedings therein be forthwith dismissed; or

That the orders appointing the receivers and their counsel be vacated, and that the court select and appoint a receiver and counsel therefor; that upon such dismissal, the receiver and his solicitors be required to return to the estate all moneys received by them on account of fees; that an order be entered requiring the filing of a claim against the estate of Edward N. Hurley, now deceased, for the amount by him received as fees as receiver; and that if the estate had suffered any loss through the payment of unlawful expense on account of the receivership, the same be paid by counsel who were responsible for the imposition of the alleged fraud.

The facts out of which this controversy arises are fully set forth in Judge Lindley's opinion in Lincoln Printing Company v. Middle West Utilities Company (D. C.) 6 F. Supp. 663, and are made a part of this opinion by reference. There is no controversy over the facts. The intervener, however, denies the correctness of Judge Lindley's conclusions.

We are first confronted with appellee's motion to dismiss the appeal for the following reasons: (1) The order appealed from is interlocutory and not appealable; (2) the equity receivership proceeding has been superseded by the reorganization proceeding under section 77B of the Bankruptcy Act (11 USCA § 207), and the case is moot; (3) appellant as an intervener under Equity Rule 37 (28 USCA § 723) cannot question the original proceedings; (4) there is no evidence that appellant is a stockholder or a party in interest; (5) appellant, if a common stockholder, has no right to intervene; (6) appellant is barred by his laches.

The allegations of appellant's intervening petition are of such character as to convince us that for the good of all parties concerned

this cause should be decided on its merits, if possible, rather than upon technicalities. For this reason we shall give but scant consideration to the motion to dismiss the appeal. We reject the first reason assigned, because the literal reading of appellant's prayer complies with section 129 of the Judicial Code (28 USCA § 227), which provides for an appeal from an order of the court refusing an order to wind up a pending receivership. That the case has become moot as to certain portions of the prayer, such as the elimination of Mr. McCulloch as receiver, we have no doubt, but the prayer is quite inclusive in its character, and there are other questions raised which we think are not moot. Under Equity Rule 37 (28 USCA § 723) we think it is clear that appellant as intervener could not question the original order appointing the receiver, nor could he rightfully demand that the original bill be dismissed. But we think the rule would not prevent him from questioning the present eligibility of the receiver, after he had been permitted to intervene, even though the ineligibility charged existed at the time of the appointment. We are further of the opinion that appellant's allegation under oath that he was a stockholder, which was not denied, nor the question raised until the filing of this motion, is sufficient proof of the fact. That a common stockholder has no absolute right to intervene we have no doubt. Nor did he, but he intervened because the court in the exercise of its discretion permitted him to do so, and we think in this the discretion was not abused. We shall consider the question of laches with the merits. The motion to dismiss the appeal is denied.

The questions presented on the merits are: (1) Did the facts amount in law to collusion and fraud, and (2) must the court, where a receivership proceeding has been instituted through collusion and fraud, discharge the receiver and wind up the receivership proceeding.

■ In considering these questions it is first necessary to determine the legal meaning of the word collusion as applied to the facts before us. In Dickerman v. Northern Trust Company, 176 U. S. 181, 20 S. Ct. 311, 314, 44 L. Ed. 423, it appeared that a bondholder had brought suit upon six coupons, and that the action was brought directly or indirectly by the legal firm who were also counsel for the defendant company, and it further appeared that the president of the company, prior to filing the suit, had been in consultation with the attorneys of the trustees about foreclosing the mortgage and taking possession of the property. The court said, "We have no doubt that this judgment was collusive in the sense that it was obtained by the plaintiff and consented to by the defendant company for the purpose of giving the trustees a legal excuse for declaring the principal and interest of the mortgage to be due, and to give authority for a foreclosure. But this did not constitute collusion in the sense of the law, nor does it meet the exigencies of the petitioners' case. Collusion is defined by Bouvier as 'an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law,' and in similar terms by other legal dictionarians. It implies the existence of fraud of some kind, the employment of fraudulent means or of lawful means for the accomplishment of an unlawful purpose; but if the action be founded upon a just judgment, and be conducted according to the forms of law and with a due regard to the rights of parties, it is no defense that the plaintiff may have had some ulterior object in view beyond the recovery of a judgment, so long as such object was not an unlawful one." We find no definition by lexicographers of the word collusion differing materially from the one here given, and we think the courts have never given it any other interpretation. It is clear that there must be fraud before there can be collusion, and it has been so held in construing section 37 of the Judicial Code (28 USCA § 80), which authorizes the dismissal of suits in the federal courts for collusion. In re Metropolitan Railway Receivership, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403.

■ The bill under which the receivers were appointed was filed by a simple contract creditor who had neither judgment nor lien, and of course had no standing in a court of equity, except by the consent of the debtor, to ask for a receiver or to seize the debtor's property in satisfaction of its claim. But when the bill was filed, the defendant by its answer admitted its allegations and consented to the appointment of the receivers, and this had the effect of changing the standing of the creditor. It thereafter had the right to ask for the appointment of receivers, and the court had the jurisdiction to hear and determine the matter. Such procedure of itself is not fraudulent, and has been recognized either with approval or at least without disapproval by the federal courts. In re Metropolitan Railway Receivership, supra; United States v. Butterworth-Judson Corpo-

ration, 269 U. S. 504, 46 S. Ct. 179, 70 L. Ed. 380; Newberry v. Davison Chemical Company (C. C. A.) 65 F.(2d) 724; May Hosiery Mills v. United States District Court (C. C. A.) 64 F.(2d) 450; Kingsport Press v. Brief English Systems (C. C. A.) 54 F. (2d) 497; American Brake Shoe & Foundry Company v. Pere Marquette Railroad Company (C. C. A.) 205 F. 14; Equitable Trust Company v. A. C. White Lumber Company (D. C.) 41 F.(2d) 60. The mere fact that a debtor or his attorneys have previously arranged with a creditor for the filing of the bill does not render the action fraudulent. In re Metropolitan Railway Receivership, supra; Blair v. City of Chicago, 201 U. S. 400, 26 S. Ct. 427, 50 L. Ed. 801; Dickerman v. Northern Trust Company, supra; Austin v. Garard (C. C. A.) 61 F.(2d) 129; Kingsport Press v. Brief English Systems, supra; Guaranty Trust Company v. International Steam Pump Company (C. C. A.) 231 F. 594; Burton v. R. G. Peters Salt & Lumber Company (C. C.) 190 F. 262; Intercontinental Rubber Company v. Boston & Maine R. R. (D. C.) 245 F. 122.

Appellant complains that the indebtedness to the Lincoln Printing Company, upon which the action was predicated, was not a bona fide one, in that it was represented by time notes which the creditor surrendered for demand notes in order to have a basis for the action. We think this situation is analogous to that in the Dickerman Case, supra, where the maturity of bonds was accelerated to permit a similar action. That case also permitted the debtor's attorneys to represent the creditor in securing a judgment on certain coupons, and to represent the trustee of the bonds in filing a bill of foreclosure. We think that is authority for sanctioning the action of the solicitors in the case at bar. While the acts just mentioned do not of themselves constitute fraud, yet they may be and are frequently done under such circumstances, and with such motives, and for such purposes as to amount to fraud which will vitiate the proceedings. Hence such proceedings should be jealously watched by the courts. The law in this respect is very clearly and forcibly stated by Mr. Justice Cardozo, in Michigan v. Michigan Trust Company, 286 U. S. 334, 52 S. Ct. 512, 515, 76 L. Ed. 1136, as follows: "This court has had occasion to point out the abuses that can arise from friendly receiverships forestalling the normal process of administration in bankruptcy and enabling a tottering business to continue while creditors are held at bay. * * *

Receiverships for conservation have at times a legitimate function, but they are to be watched with jealous eyes lest their function be perverted." Again, in Shapiro v. Wilgus, 287 U. S. 348, at page 356, 53 S. Ct. 142, 144, 77 L. Ed. 355, 85 A. L. R. 128, the same justice speaking for the court said, "True indeed it is that receivers have at times been appointed even by federal courts at the suit of simple contract creditors if the defendant was willing to waive the irregularity and to consent to the decree. This is done not infrequently where the defendant is a public service corporation and the unbroken performance of its services is in furtherance of the public good. * * * It has been done at times, though the public good was not involved, where legitimate private interests might otherwise have suffered harm. * * * We have given warning more than once, however, that the remedy in such circumstances is not to be granted loosely, but is to be watched with jealous eyes. * * * Never is such a remedy available when it is a mere weapon of coercion, a means for the frustration of the public policy of the state or the locality. It is one thing for a creditor with claims against a corporation that is legitimately his debtor to invoke the aid of equity to conserve the common fund for the benefit of himself and of the creditors at large. * * * Whatever hindrance and delay of suitors is involved in such a remedy may then be incidental and subsidiary. It is another thing for a debtor, co-operating with friendly creditors, to bring the corporation into being with the hindrance and delay of suitors the very aim of its existence. The power to intervene before the legal remedy is exhausted is misused when it is exercised in aid of such a purpose. Only exemplary motives and scrupulous good faith will wake it into action."

In determining whether there was fraud present in the appointment of the receivers it was necessary to consider the character of the corporation and its relationships, the interest of all parties concerned, the existing conditions, the actions and motives and purposes of the moving parties, and all other matters which directly or indirectly tended to prove fraud, or from which fraud might rightfully be inferred. Of necessity a wide latitude in the admission of testimony was necessary, which was permitted by the court.

The Middle West was not a public service corporation. It was what is known as a "holding company," engaged in buying, selling, and holding stocks, bonds, and securities of other corporations, and rendering

them financial advice and assistance, and furnishing them engineering and managerial services. When the bill was filed it owned a substantial interest in, and controlled more than eighty-five public utility companies engaged in rendering electric, gas, water, heat, railway or bus service in over 5,000 communities located in thirty-two different states and Canada, with a population exceeding 6,500,000 persons. In addition it had extensive investments in the Commonwealth Edison Company, which controlled and operated the electric industry in Chicago; the People's Gas, Light and Coke Company, which controlled and operated the gas utility in Chicago; and the Public Service Company of Northern Illinois which owned and operated the electric, gas, and other utilities generally throughout Northern Illinois and in communities adjacent to Chicago. The accused banks were heavily interested in the ownership of securities of the three last named operating companies, and also large amounts of the same which were held by them as collateral security on private and individual loans. Those three public utilities formed the foundation upon which the Insull utilities organization had been constructed. They were solvent, were paying dividends, and their capital stock was widely distributed and held by hundreds of thousands of individuals throughout the nation, and were regarded as quite valuable and substantial assets. The banks, indeed, were deeply concerned and alarmed lest the collapse of the Middle West and its affiliated investment trusts might destroy the public confidence in the operating companies as well as Middle West and the investment trusts. It was under these conditions, together with the general depression throughout the nation, that it was thought advisable by the moving parties to ask for a receivership, and time has abundantly justified that conclusion. For more than a year and a half appellant never questioned the necessity of the receivership. As early as June, 1932, he attempted unsuccessfully to intervene in order to protect his interest. The only specific relief demanded at that time, however, was the modification of the order of appointment of the trustees and one of the two firms of attorneys, and the substitution of others in their stead. His intervening petition which is now before us likewise contemplated a continuation of the receivership, at least with respect to the alternative relief demanded. Under all the circumstances we think it can not be denied that at the time the receivers were appointed an equity receivership for the conservation of the assets of Middle West was a legitimate function within the meaning of Michigan v. Michigan Trust Company, supra. It remains to be determined, however, whether that was the actuating purpose of the moving parties, or whether the rightful function of conservation was prevented. The determination of this question must be "watched with jealous eyes" and the language and acts of the moving parties should be most strongly construed against them, for, under such circumstances, it is only exemplary motives and scrupulous good faith that will activate the helpful arm of equity.

■ Aside from conservation of assets, which an equity receivership would more efficaciously accomplish if conducted properly, it was desired by the moving parties that there should be a reorganization effected, and this it is claimed by them could be accomplished more easily under an equity receivership than under bankruptcy, or any other procedure. That this is true we have no doubt. In re Morosco Holding Company, Inc. (D. C.) 296 F. 516; In re Hudson River Electric Power Company (D. C.) 173 F. 934; Woolford v. Diamond State Steel Company (D. C.) 138 F. 582. See, also, "Federal Legislation for Corporate Reorganization" (Swaine), American Bar Association Journal, December, 1933.

■ It is urged, however, by appellant that the real purpose and design of the receivership proceedings was to protect Samuel Insull and the creditors who met in a conference at the Chicago Club on Sunday, April 10, 1932, which is described fully in Judge Lindley's opinion, and not to protect the other creditors, more especially the unsecured creditors including the owners of the common stock. He insists that that purpose is manifest from the facts that the absent creditors were not notified of the meeting and that representatives of all classes of creditors were not present and had no voice in determining the program; that the receivers appointed were previously agreed upon and afterwards nominated for appointment by the creditors present at that meeting; that Insull was an officer of Middle West, and that Hurley and McCulloch were directors respectively of the Central Republic Bank, and the First National Bank, which were large secured creditors of the Middle West, and which also held large amounts of that debtor's obligations as collateral security for other loans.

The fact that certain creditors secretly agreed to ask for a receivership, without notifying other creditors, may or may not, under certain conditions, amount to fraud, de-

pending upon the surrounding circumstances and the motives and purposes of those asking for the receivership. If the object of the plan agreed upon was not really for the conservation of assets for the benefit of all creditors, but in fact amounted to an effort to wrongfully prefer and protect the claims of the agreeing creditors without protecting the rights of the unnotified creditors, then fraud would be manifest, and under those circumstances the fact that notice had not been given the other creditors would be a circumstance strongly supporting a charge of fraud. If, however, under existing conditions, it is obvious that an equity receivership was necessary to efficiently protect the rights of all creditors, and the agreeing creditors of whatever class or classes, were actuated by exemplary motives in planning and instituting the action, and were in scrupulous good faith in attempting to protect the rights of all creditors, then the fact that the previous notice was not given to certain creditors would not of itself support a charge of fraud.

█ It is contended by appellant that the creditors who secretly planned the receivership did so with the intention of wrongfully preferring and protecting their interests and those of Insull in disregard of the rights of the other creditors and common stockholders. That contention is not supported by the record. It was not denied that Insull had opposed a receivership until at a meeting of creditors in New York on April 8, attended also by representatives of Chicago banks, it was decided that a receivership was unavoidable. That decision apparently was due largely, if not entirely, to the fact that the New York banks refused to extend further financial assistance. Insull was present at that meeting and knew of its decision, and when the other Chicago members of that meeting returned to their homes they were notified that Insull had called a meeting at the Chicago Club for Sunday afternoon to discuss the receivership, which at that time was considered inevitable by all the parties who attended. So far as the record discloses, that meeting was not prearranged by any one there present except Insull. The creditors had no knowledge of it until they were requested by him to attend, and displeasure was expressed by some of them that Insull had taken it upon himself to call the meeting. The details of that meeting are fully set forth in Judge Lindley's opinion, and for the sake of brevity we shall not repeat them. The creditors who were invited attended. Without the opportunity for a conference outside

the presence of Insull, some of those creditors, including representatives of Chicago banks, decided that they would oppose at that meeting (1) any final agreement as to who should be recommended to the court as receivers, and (2) any plan which would permit Insull to dominate either the business or the receivership. That program was successfully carried out at that meeting.

█ It developed in the meeting that Insull did not want to be receiver but insisted instead on being manager. This suggestion was not agreed to by the creditors because of Insull's domineering character. They concluded that his knowledge and cooperation would be necessary in the conduct of the receivership, and they were of the opinion that he could be better controlled as a joint receiver than as manager under the receivership. That suggestion was opposed by Insull, but, after several meetings during that week, he acquiesced in the suggestion of the creditors. Accordingly, after considering many names, the creditors agreed to suggest to the court the names of Insull, Hurley, and McCulloch, and that was done. The court, after privately consulting and interrogating the nominees, first separately and then severally, and fully advising them of their duties, made the appointments and specifically advised them that any indication of domination of one over another would result in the discharge of the offender. The mere fact that the agreeing creditors suggested to the court the names of those who were afterwards appointed receivers is not sufficient cause to set aside the appointment unless their lack of character and fitness or other incligibility amounted to an abuse of the court's discretion. Farmers' Loan & Trust Company v. Northern Pacific Railway Company (C. C.) 61 F. 546; Land Title & Trust Company v. Asphalt Company of America (C. C.) 120 F. 996; Burton v. R. G. Peters Salt & Lumber Company (C. C.) 190 F. 262.

█ It is urged by appellant that Samuel Insull's appointment was illegal because he was an officer of Middle West. It would not be correct to say that no one should ever be appointed receiver of a corporation of which he is an officer. The legality of such appointment depends upon the surrounding circumstances of each particular case. That those circumstances and conditions should be watched and considered with a jealous eye lest the legitimate function of the receivership be perverted, can not be too strongly emphasized. But instances sometimes arise when such an appointment seems imperative in or-

der to protect the interests of all concerned, and in such cases when exemplary motives and good faith are present, the appointment will not be considered illegal. Such, we think, were the conditions which confronted the court when this appointment was made. No one denied the marvelous ability of Insull or his vast knowledge of the corporate structure of the debtor with its tremendous ramifications, which no one else possessed. Obviously that ability and knowledge were necessary to prevent a collapse of the entire structure, and the necessity was immediate. Based on the facts which were then disclosed to the court we think the appointment was not illegal. In re Babcock (C. C. A.) 26 F.(2d) 153; Kingsport Press v. Brief English Systems, supra.

■ At the time of the appointment some of the agreeing creditors had knowledge which they failed to disclose to the court that Insull had been guilty of some irregularity with relation to certain securities of one of the companies, which weighed strongly against his moral fitness to act as receiver. Of that fact neither the court nor the other receivers had knowledge at the time of the appointment. Later Hurley and McCulloch were informed of the fact, and they immediately told Insull that he must resign. They further sent one of their attorneys to Judge Lindley to inform him of the fact, and of their action in the matter. Judge Lindley informed the attorney that he, too, had learned of the fact and had already requested Insull to resign. Accordingly, Insull tendered his resignation and it was accepted on the fifty-third day after his appointment. Appellant has not criticized any act or failure to act on his part while he was co-receiver, but challenges only his right to act at all. The record discloses no acts of domination on his part, nor any tendency whatever to wrongfully protect one creditor above another, nor to jeopardize the interests of the common stockholders. It may be that those conditions prevailed because of the jealous watchfulness of his co-receivers, but if that be true it is quite persuasive of the soundness of the original plan of the agreeing creditors, and shows no disposition on their part to violate the rights of any interested party.

■■ It is further urged by appellant that the appointments of the other two receivers were illegal because at the time they were made Hurley was a director of the Central Republic Bank, and McCulloch was a director of the First National Bank, both of which banks were interested in Middle West, not only as secured holders of its commercial notes, and as holders of unsecured serial notes, but as holders of common and preferred stock as collateral for loans to their customers. Whether such relationship amounted to disqualification depends upon whether the surrounding circumstances of this particular case disclose a conflict of interests between the receivers and the banks of which they were directors. At the time of the appointments there was no controversy or conflicting interest, and none has since arisen, between the banks and the estate of Middle West, over any matter except as to the deposit of additional collateral security for existing indebtedness within four months prior to the almost simultaneous filing of the bill for receivership, and the involuntary petition in bankruptcy. It is well settled, however, that a receiver can not maintain an action to set aside such transfers, but it can be maintained only by the trustee in bankruptcy.

■ As affecting the disqualification of Hurley and McCulloch our attention is called to In re Insull Utility Investments, Inc. (D. C.) 6 F. Supp. 653, wherein, under somewhat similar circumstances, the court held that the main action in equity for the appointment of receivers was collusively brought for the probable purposes of assisting Insull in perpetuating his control and avoiding liability, and in obtaining for the secured creditors the appointment of receivers who would not too aggressively or ably prosecute the company's suit to recover hypothecated assets which had been pledged to them as security. Of course, the general rule, as hereinbefore stated, is that equity receivers can not maintain a suit to recover collateral pledged by the debtor for the payment of its debts. In the Fentress case, however, owing to the peculiar form of that company's debentures, it was contended that the receivers would have the right to maintain such action. That element does not arise here since none of the debentures of Middle West contain the provisions upon which that contention is based. Moreover, this record discloses no evidence from which it could rationally be inferred that the purpose of the receivership was to perpetuate Insull's control or to avoid any of his liabilities. Under the circumstances presented by this record, we think it can not be said that either Hurley or McCulloch was disqualified to act as a receiver merely because they were directors of certain creditor banks.

■ There were two firms of attorneys agreed upon and appointed to represent the receivers. Their ability and integrity are

not questioned in this proceeding, but appellant questions the eligibility and fitness of one of the firms to act in that capacity because at the time of the institution of the receivership proceedings the members of that firm were acting as attorneys for Insull and had been for some time. It appears that the firm of Burry, Johnstone, Peters and Dixon was suggested as counsel for the receiver by a representative of the First National Bank, and the firm of Schuyler, Weinfeld and Dunbar was suggested by the Continental Bank. Had it been the duty of the receivers to sue the banks, they would have been disqualified, and both firms of lawyers would likewise have been disqualified, but under the facts as disclosed by the record, there was no conflict of interest of a disqualifying character. The firm of Schuyler, Weinfeld and Dunbar was general counsel for the Corporation Securities Company, an allied investment trust. They had never been counsel for Middle West. Mr. Dunbar in the past had been counsel for one of the constituent banks merged with the Continental. Mr. Schuyler had upon many occasions been counsel for Samuel Insull, but the record discloses that the intimate personal counsel of Mr. Insull were the members of the firm of Isham, Lincoln and Beale. If there were any evidence that a firm of lawyers who had previously represented an executive of the corporation was suggested to the court with a view of protecting such executive in any matters that might grow out of the previous administration of the estate, clearly their appointment should not have been made, but there was no such evidence and no conflict of interest was disclosed. A perusal of the evidence convinces us that Judge Lindley's statement of facts in this respect is fully supported and is not contradicted, and we think his conclusions thereon are correct.

In determining the motives and purposes which actuated the promoters of the receivership, it is but fair to consider the manner in which the receivers conducted the business, and the results of their administration. Such consideration adds great force to the conclusions hereinbefore stated. Mr. Hurley died before the intervening petition was filed, after having served nineteen months, and from the date of his death, Mr. McCulloch acted as sole receiver until the receivership was superseded by the reorganization under section 77B of the Bankruptcy Act, and since that time he has had no connection with the estate. During the entire receivership no conflict of interest appeared between the receivers and any of the secured creditors. A return of certain pledged securities, however, was made by the banks as a result of an agreement between them and the noteholders committee, but the receivers had nothing whatever to do with that settlement, as it was clearly outside the scope of their rights and duties. No one has questioned the wisdom of that settlement, nor denied the beneficent result which enured to the estate by reason of it. No complaint was ever made by any creditor or stockholder of any act, or failure to act, on the part of either receiver.

The evidence discloses that from the date of their appointment to the end of the year 1933, the receivers had decreased the bank loans of subsidiaries by over $5,000,000, increased the subsidiaries' cash balances by over $4,000,000, arranged for the purchase by subsidiaries of their own bonds at a discount, and altogether improved the condition of the subsidiaries to the extent of almost $15,000,000. During the same period they produced for Middle West an excess of income over expenses, excluding receipts from liquidation of assets, of $483,000, and the expenses of the Chicago office of the company were reduced from $2,000,000 under Insull's management in 1931, to $596,000 in 1933.

The administration of the receivers has had the approval of the noteholders committee which represents $30,000,000 of the $40,000,000 outstanding gold notes; of the preferred stockholders committee; of the only organized common stockholders committee; of the secured creditors; and of the petitioning creditors in bankruptcy.

It is disclosed by the record that the common stock is worthless and will probably remain so, but that condition is not chargeable to the receivership or its promoters. It is worthy of note, however, that by reason of the excellent management of the receivers, when the trustee in bankruptcy was appointed under section 77B, supra, in 1934, the estate was found to be in a condition for immediate reorganization. Under the undisputed facts, we think it clear that the receivership proceedings were not actuated by any wrongful, collusive, or ulterior motive or purpose. It can not be denied that the proceedings preliminary to these appointments traveled very close to the line of propriety, yet we are convinced that the character and ability of Mr. Hurley and Mr. McCulloch, and the results of their administration are sufficient to classify this receivership as one of conservation for the benefit of all creditors, and that its function was legitimate and properly exer-

cised under the rule laid down in Michigan v. Michigan Trust Company, 286 U. S. 334, 52 S. Ct. 512, 76 L. Ed. 1136. In view of our conclusions, it is unnecessary to discuss the question of laches.

Decree affirmed.