## In re MIDDLE WEST UTILITIES CO.
### No. 49923.

District Court, N. D. Illinois, E. D.
Sept. 29, 1936.

On Rehearing Dec. 4, 1936.

364

Jacobson, Merrick, Nierman & Silbert, Kirkland, Fleming, Green, Martin & Ellis, Cutting, Moore & Sidley, Taylor, Miller, Busch & Boyden, Tarnopol, Flamm & Sideman, Samuel A. & Leonard B. Ettelson, and Mayer, Meyer, Austrian & Platt, all of Chicago, Ill., White & Case, of New York City, and Thomas V. Sullivan, Patrick J. Lucey, Gannon, McGinn & Whitson, Julius Moses, Frank J. Loesch, Fisher, Boyden, Bell, Boyd & Marshall, Sims & Stransky, James H. Benjamin, Essington & McKibbin, Ryan, Condon & Livingston, Adams, Nelson & Williamson, D. Ryan Twomey, Frank L. Hume, Weil & Tell, and Tom D. McKeown, all of Chicago, Ill., pro se.

Burry, Johnstone, Peters & Dixon and William J. Froelich, all of Chicago, Ill., for trustees.

James B. Alley, General Counsel, Max O'Rell Truitt, Solicitor, and William Radner, all of Washington, D. C., and Lee Walker, Rex Bullinger, and Arthur A. Armstrong, all of Chicago, Ill., for Reconstruction Finance Corporation, objector.

WILKERSON, District Judge.

In the decree of November 27, 1935, approving the plan of reorganization as modified, the court reserved determination of allowances for expenses and services in connection with these proceedings. The court also reserved for consideration the question of allowances in the equity and bankruptcy proceedings which preceded the filing of the petition under section 77B, Bankr.Act, 11 U.S.C.A. § 207.

In exercising the reserved authority as to allowances under section 77B, the court is not bound by any agreements as to amounts which the parties seeking such allowances may have made among themselves. The statute imposes on the judge the duty of determining the amounts of such allowances in accordance with the standard prescribed by the statute. Provisions in a reorganization plan or agreement among those seeking allowances as to what each one is to receive cannot relieve the court from the responsibility. Under the statute, two-thirds of each class of creditors and the majority of each class of stockholders may agree upon a reorganization plan. The statute specifies what may be included in such a plan. Allowances for services and expenses are not expressly included in the enumeration of those things which may be a part of the plan. On the contrary, it is expressly provided that the judge may allow compensation for such services and expenses. The history of this legislation, as well as the language of the statute, indicates clearly that it was the intention of Congress to remove the fixing of allowances for services and expenses from the field of those things upon which the parties in a reorganization proceeding may agree among themselves. The reason behind this is obvious. One who is asking others to consent to an allowance for himself is not in a position to view impartially the services of those whose consents he is seeking to obtain.

Twenty-three applications for allowances were filed. In accordance with the direction of the court, the applications were accompanied by itemized statements of services rendered and expenses incurred. It was suggested that the statements cover the section 77B proceedings and the prior equity and bankruptcy proceedings. This seemed to be the simple and direct method of getting all of these claims before the court. All of the cases are in this court. Allowances made in the equity and old bankruptcy proceedings are subject to review as to reasonableness by the judge ordering payment under section 77B (i), 11 U.S.C.A. § 207 (i) in the reorganization proceeding. Callaghan et al. v. Reconstruction Finance Corporation, 297 U.S. 464, 56 S.Ct. 519, 80 L.Ed. 804. In adopting this course, it was considered that appropriate orders could be made in the prior cases with reference to allowances, if any, which come under the provisions of section 77B (i) and the payment of such allowances by the new company could be authorized in this proceeding.

The petitioners who seek allowances include the attorneys for plaintiffs in the equity suit, the receiver in the equity suit and his counsel, the attorneys for the executors of the estate of Edward N. Hurley, deceased, one of the receivers in the equity suit, the attorneys for the petitioning credi-

tors in the bankruptcy suit and reorganization proceedings, the common stockholders' committee and its counsel, the preferred stockholders' committee and its counsel, the noteholders' committee and its counsel, and the reorganization committee and its counsel. In addition, there are seven petitions filed by those who claim as attorney or agent for creditors and stockholders to have made contributions to the formulation of the plan approved by the court.

The allowances requested amount to more than $1,600,000. Objections to some of the claims were filed by various parties in interest. Objections to all of the claims were filed by the Reconstruction Finance Corporation which holds 170,000 shares of the stock of the new company. Evidence was presented, oral arguments were heard, and briefs were submitted.

The statements of services are quite lengthy. In some cases the work of the court was increased by the indiscriminate intermingling of services as to which, plainly, the attorney must look to his client for compensation with services for which he is entitled to an allowance out of the fund within the court's control under some principle of equity or some provision of the bankruptcy statutes.

The bill in the equity suit was filed in April, 1932. Plaintiff was a simple contract creditor. The defendant consented to the appointment of receivers. The circumstances leading up to the filing of the bill and the principal steps in the equity suit are stated in Judge Lindley's opinion in Lincoln Printing Co. v. Middle West Utilities Co. (D.C.) 6 F.Supp. 663, and in the opinion of the Circuit Court of Appeals 74 F.(2d) 779.

At the time the bill was filed the Middle West Company had outstanding about 16,000,000 shares of no-par common stock of a stated value of $10 a share and 606,369 shares of preferred stock of a liquidation value of $100 per share. It was a holding company and owned a substantial interest in and controlled more than 85 public utility companies serving more than 5,000 communities in 32 states and Canada, with a population of more than 6,500,000. In addition, it had extensive investments in Commonwealth Edison Company, Peoples Gas Light & Coke Company, and Public Service Company. It owed more than $88,000,000. Of that amount $40,000,000 was represented by unsecured notes which

had been sold to the public. About $25,000,000 of its indebtedness consisted of loans from the First National Bank of Chicago, the Continental Illinois Bank & Trust Company of Chicago, the Central Republic Bank & Trust Company, the Bankers Trust Company of New York, and Halsey, Stuart & Co. Most of its assets which had a market value had been pledged as collateral security for the bank loans, collateral of the value of more than $8,000,000 having been pledged within four months of the date of the filing of the bill.

The involuntary petition in bankruptcy was filed on April 15, 1932, the day on which the equity receivers were appointed. The assets of the respondent were in the possession of the banks and the equity receivers. The banks, obviously, were opposed to an adjudication in bankruptcy, as it would open the way to suits by a trustee to set aside the preferences alleged to result from the pledging of additional collateral within the four-month period. The right of the banks to retain that collateral could not be attacked by any of the parties or the receivers in the equity receivership. Counsel for the noteholders' committee intervened in the bankruptcy proceeding and later joined the attorneys for the petitioning creditors in an attempt to supersede the equity receivership by an administration of the estate in bankruptcy. The attorneys for the committees of preferred and common stockholders which had intervened in the equity suit applied for a rule on the receivers to resist the bankruptcy proceedings in the name of the Middle West Company. The court refused to make such an order, but authorized the attorneys for the preferred and common stockholders' committees to contest the petition for adjudication. Lincoln Printing Company v. Middle West Utilities Company, supra, 6 F.Supp. 663, at page 680. The counsel authorized to represent the respondent tried to have parts of the petition stricken. Their motions were overruled, and the ruling of the District Court was sustained on appeal. In re Middle West Utilities Co. (C.C.A.) 70 F.(2d) 825.

The petition under section 77B was filed before there was a final hearing on the petition in the original bankruptcy proceeding.

During the pendency of the equity suit, a question arose as to its alleged fraudulent or collusive character. Judge Lindley, sua

sponte, directed a hearing on that issue and named special counsel to conduct a disinterested inquiry. A fee of $10,000, awarded to the special counsel in the equity suit, was paid in this proceeding. All of the counsel for the intervening committees of noteholders and stockholders, as well as counsel for the banks, participated in the hearing and resisted the charge of fraud and collusion. One intervener, Pollak, sought to prove that the suit was fraudulent and to have the suit dismissed and the receivers discharged. The ruling of the District Court is found in Lincoln Printing Company v. Middle West Utilities Company, supra. That ruling was affirmed in Lincoln Printing Co. v. Middle West Utilities Co. (C.C.A.) 74 F.(2d) 779. Certiorari was denied by the Supreme Court in Pollak v. McCulloch, 295 U.S. 746, 55 S. Ct. 659, 79 L.Ed. 1691.

The administrative work of the equity receivership was large. There were 19 ancillary receiverships. The Middle West Company controlled, through stock ownership, more than 85 utility corporations. The equities in some of them were worthless; in others, of doubtful value. There was a tangle of intercorporate relations and transactions to be straightened out. The equity receivers and their counsel were engaged in this "process of organization, elimination and correlation." The printed record in the equity suit, which was introduced as a part of the record on this hearing, consists of more than 1,400 pages. The attorneys for the intervening noteholders' and stockholders' committees attended the hearings relative to administrative details, watched the proceedings, offering suggestions and at times assisting the attorneys for the receivers in conducting negotiations and in preparing and presenting matters to the court.

Several of the petitioners ask allowances for services in connection with the settlement agreement between the committees of noteholders and stockholders and the petitioning creditors in the bankruptcy suit on the one side, and the banks on the other side. That agreement was approved by the judge in the equity suit. The controversy which it was attempted to adjust by that agreement related to the right of the banks to retain the additional collateral pledged as security for their loans to the Middle West Company within four months of the filing of the petition in bankruptcy. The facts relating to that agreement will be stated more fully in considering the law applicable to allowances in equity cases.

The petition under section 77B was filed in the original bankruptcy suit and the petitioning creditors were the same as those in the original petition. Upon the approval of the petition with the consent of the debtor, Daniel C. Green was appointed trustee, and the assets came under the control of the bankruptcy court for reorganization purposes. The bankers, the committees of noteholders and stockholders, and the petitioning creditors in the bankruptcy suit continued the negotiations for a reorganization plan which had been commenced during the equity proceedings. In framing the plan, the bank settlement agreement was accepted as the basis for adjusting the disputes between the secured and unsecured creditors and stockholders. It was apparent that the property must be reorganized as a unit. If the banks sold the collateral which they retained, the resulting dismemberment of the system would have made liquidation of the remaining assets probable, if not inevitable. The problems of those who undertook the work of framing a plan which would meet the requirements of the statute and at the same time receive the necessary consent of the creditors and stockholders were complicated and difficult. There were objections to the plan in the form which was first proposed to the court on the ground that the provisions for participation in the new company by stockholders of the old were inadequate. There were objections to an amended plan on the same ground. Intervening groups of noteholders and stockholders asserted that the plan gave to the banks more than they were entitled to on a fair valuation of the property for reorganization purposes. At the hearings before the court on the plan the attorneys for the petitioning creditors, the banks, and the noteholders' committee attempted to show that the value of the property to be reorganized was less than $20,000,000. The court appointed Walter A. Shaw, a former member of the Illinois Commerce Commission and an engineer of high standing, to make an independent study and valuation of the property. He placed a valuation of between $55,000,000 and $60,000,000 on the property. As a result of the hearings, there was another modification of the plan which enlarged to some extent the participation of the stockholders of the old company in the stock of the new. The

amended plan was adopted by the court on November 27, 1935, with practically the unanimous approval of all of those who had taken part in the protracted negotiations and hearings. Of course, as in all reorganizations, each group tried to get as much as possible for itself, and there was a practical recognition of the necessity for concession and compromise, without which a reorganization plan cannot be framed.

The petitions for allowances include services rendered in the reorganization proceedings other than those in connection with the plan. Among those are the services of the trustee and his counsel. To prepare the way for reorganization it was necessary to dispose of many claims and counterclaims. This work was generally performed by the attorneys for the trustee. In some cases, by consent or acquiescence of the attorneys for the trustee, the work was done by the attorneys for the noteholders' committee. An example of this is the settlement with the Mississippi Valley Utilities Company.

### The Statute.

Express authority to make allowances for services and expenses is found in paragraphs (c) (9) and (i) of section 77B (11 U.S.C.A. § 207 (c) (9), (i) as follows:

(c) "Upon approving the petition or answer or at any time thereafter, the judge, in addition to the jurisdiction and powers elsewhere in this section conferred upon him."

(9) "May allow a reasonable compensation for the services rendered and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and the plan by officers, parties in interest, depositaries, reorganization managers and committees or other representatives of creditors or stockholders, and the attorneys or agents of any of the foregoing and of the debtor."

(i) "If a receiver or trustee of all or any part of the property of a corporation has been appointed by a * * * court * * * the trustee or trustees appointed under this section, or the debtor if no trustee is appointed, shall be entitled forthwith to possession of and vested with title to such property, and the judge shall make such orders as he may deem equitable for the protection of obligations incurred by the receiver or prior trustee and for the payment of such reasonable administrative expenses and allowances in the prior proceeding as may be fixed by the court appointing said receiver or prior trustee."

### Allowances in the Equity Suit.

As to the allowances sought under paragraph (i) on account of services in the equity suit, the court must deal with them as if the claims had been filed in that suit and must allow or disallow them in accordance with the principles applicable to equity proceedings. It is elementary that the equity court has power to make allowances to the solicitors for the plaintiff and defendant and to its receivers and their solicitors. It is also well established in the federal courts that one jointly interested with others, in a common fund, through whose exertions the fund is recovered or saved from waste, is entitled to reimbursement of his costs as between solicitor and client either out of the fund itself, or by proportionate contributions from those who receive the benefit of the litigation; and that, when the allowance is proper on account of solicitors' fees, it may be made directly to the solicitors themselves without the application of their immediate client. Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157; Central R. & B. Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L. Ed. 915; Hobbs v. McLean, 117 U.S. 567, 6 S.Ct. 870, 29 L.Ed. 940; Winton v. Amos, 255 U.S. 373, 391, 41 S.Ct. 342, 349, 65 L.Ed. 684; United States v. Equitable Trust Co., 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379. It is generally recognized, however, that the power is capable of great abuse and must be exercised with caution and regard to the rights of litigants. The power should not be exercised in doubtful cases; nor should the rule be extended to a case which does not fall within the reason underlying the rule as it is pointed out in the decisions of the Supreme Court cited above.

The equity court, therefore, should pass upon the requests of the solicitors for the plaintiff, the receiver and counsel for the receiver, and make allowances, if the applicants have not been compensated adequately by allowances heretofore made to them. This will be covered by separate findings and order in the equity suit.

The requests of committees of noteholders and stockholders who intervened in the equity suit, and their solicitors, for allowances on account of work done in the equity suit, are on a different footing. We

are not now dealing with the propriety of allowances under section 77B (c) (9) for services and expenses in connection with the plan rendered prior to the filing of the 77B petition, nor are we considering the effect of the provisions of the plan and decree as to allowances. We are dealing solely with the right, under equitable principles, of the intervening committees and their counsel to allowances out of the fund for services which it is alleged enhanced the fund and protected the equity suit.

*The Bank Settlement.*

Allowances are requested by counsel for the receivers and by stockholders' and noteholders' committees and their attorneys, and also by attorneys for petitioning creditors in the bankruptcy suit, for services in procuring the agreement whereby the differences between the banks and the unsecured creditors and stockholders relative to the collateral pledged with the banks within the four-month period preceding the filing of the bankruptcy petition were adjusted. The claim is based upon the alleged enhancement of the trust fund as a result of their efforts.

The facts as to this agreement are set out by Judge Lindley in Lincoln Printing Co. v. Middle West Utilities Co., 6 F.Supp. 663, at page 680, as follows:

"It is well recognized that such a transfer of additional security to an existing indebtedness may not be attacked by a receiver in equity. He stands in the shoes of the corporation, for which he is receiver. He cannot maintain a suit to set aside any such preferential transfers. Such right of action is lodged solely in a trustee in bankruptcy, who may recover such transfers, if he can prove in a plenary suit that, at the time the property was transferred, the transferor was insolvent, and the transferee had reasonable cause to believe that he was thereby obtaining a preference.

"When this situation developed, it appeared that it might be necessary, in spite of the undesirability of such action, so far as liquidation was concerned, to force the petition in bankruptcy to an adjudication and elect a trustee who might bring about the recovery of preferences. Thereupon the noteholders' committee intervened as additional counsel in the bankruptcy cause, and, in association with counsel for the petitioning creditors, insisted upon a trial. Counsel for common and preferred stockholders then appeared before this court and asked that an order be entered requiring the receivers to enter their appearance in the bankruptcy cause, representing the corporation, and defend the petition in bankruptcy. Such counsel insisted that bankruptcy would mean the elimination of their clients, the stockholders, from any equity in the property and from sharing in any distribution of the assets of the estate. Upon this motion the order of the court was that the receivers could not properly defend the petition in bankruptcy. To be required to do so would put them in a position of fighting a battle in behalf of the creditor banks, who, obviously, did not desire bankruptcy. Receivers in equity may not properly aid either party to a controversy between creditors. But, said the court, while it is not the receivers' duty to contest bankruptcy, counsel for the stockholders, interested in salvaging the equity of the estate for their clients, and therefore interested in preventing bankruptcy, should be and were authorized to contest the petition for adjudication.

"In this situation, the only parties who had a right to object to the transfer, that is, the unsecured creditors, submitted to the banks the proposition of whether they would rather settle or fight it out in litigation of preference suits after adjudication in bankruptcy. A meeting of the interested parties occurred before Judge Wilkerson, who was hearing the bankruptcy proceeding, and myself, in which it was frankly stated that, if bankruptcy were to be averted, it would be because of satisfactory settlement of the parties, and that, in the absence of such agreement, within a reasonable time, the bankruptcy case would be set down for trial.

"Thereafter a settlement agreement was negotiated by the noteholders, common and preferred stockholders, and petitioning creditors on the one side and the banks on the other. The position of the receivers all through the negotiations was one of neutrality. They were directed by the court, however, to furnish access to all their records to all the interested parties, so that, if settlement should be made, it would be with full knowledge upon the part of all interested parties of all such facts as the receivers could supply. Beyond that in such controversy the receivers could not go. They could not rightfully inject themselves into the dispute, and were without legal basis so to do."

As to the effect of the bank settlement agreement Judge Lindley said (6 F.Supp. 663, at page 684):

"It was estimated by the noteholders' committee that the four months collateral in question had a value of $8,302,947.70. As a result of the settlement agreements, the noteholders and stockholders of Middle West benefited as follows: (1) The three banks gave up 33⅓ per cent. of their four months collateral; (2) Halsey, Stuart & Co. gave up 50 per cent. of its four months collateral; (3) the three banks released Middle West from its assumption of liability on loans totaling more than $2,900,000; (4) the three banks procured LaSalle-Quincy Corporation to release Middle West from notes totaling over $4,000,000 and an open account of more than $200,000, and procured a subsidiary of LaSalle-Quincy Corporation to release a subsidiary of Middle West from a claim of $23,000; (5) the three banks and Halsey, Stuart & Co. gave Middle West a cash credit of about $220,000 to apply on future interest, and reduced their interest rate from 4 per cent. to 2¾ per cent., representing an interest saving of about $177,-000 per annum; (6) the deficiency claims of the three banks and Halsey, Stuart & Co. were reduced 66⅔ per cent.; (7) the gold notes owned by the banks, totaling over $800,000 were taken from a secured, and put upon an unsecured, basis, thus further increasing the distributive share of the noteholders; and (8) Middle West was also indemnified against a possible claim upon People's Trust Bank stock of a possible maximum of $250,000.

"As a result of the bank settlements, the noteholders and stockholders were given a stronger position in a reorganization in important particulars, viz.: (1) The secured debt ahead of them was reduced by several millions of dollars; (2) their stock ownership in subsidiaries was increased by the return of collateral; (3) the assets of the estate were conserved in the meantime by the interest credit and the reduction in interest rate; (4) controversies were eliminated, and the necessity removed of delaying reorganization plans until the termination of expensive and extensive litigation, which would involve appraisals estimated to cost as much as $750,000; and (5) co-operation has been established among the interested parties by accomplishing substantially all that would be accomplished by setting aside alleged preferences to the banks, thereby affording encouragement to hope that the assistance of all creditors and stockholders to effect a reorganization of Middle West will be furnished."

An analysis of the steps leading up to the agreement shows that there was not such a recovery or preservation of a trust fund as to bring the claims for allowances within the rule stated in Trustees v. Greenough and other cases cited above. Judge Lindley's opinion clearly shows that the services of the various committees and their counsel were not rendered in an entirely disinterested manner for the benefit of the estate as a whole; but that each group had a selfish object in view with reference to its ultimate participation in the fund. The noteholders were interested in pressing the bankruptcy suit because an adjudication in bankruptcy would cut off the stockholders from any further participation in the fund. The success of the petitioning creditors and noteholders in the bankruptcy suit would not have enhanced the fund in the custody of the equity court. It would have removed the fund from the control of the equity court to the bankruptcy court. The banks and the stockholders each had a special interest in defeating the bankruptcy proceedings; the banks because the dismissal of the bankruptcy petition would have left them in unmolested possession of the collateral; the stockholders because an adjudication of insolvency would have ended their right to any part of the fund. It appears clearly that the services of the attorneys for each group were directed toward something of special benefit to that particular group alone in the distribution of the fund. For that reason the trust fund rule cannot be invoked. The settlement agreement did not really amount to the recovery of a fund. It was an adjustment of controversies relating to an existing fund. It was an important step in the reorganization and should be dealt with as such under section 77B (c) (9). It cannot be made the basis, however, of allowances in the equity case to be paid here under section 77B (i).

*The Pollak Intervention.*

The facts with reference to the institution of that hearing are stated by Judge Lindley in Lincoln Printing Company v. Middle West Utilities Company, supra, 6

F.Supp. 663, at pages 664, 665. When Judge Evans made his ruling in the Insull Utilities Investments, Inc. Case (D.C.) 6 F.Supp. 653, Judge Lindley instituted a hearing in the Middle West Case for the purpose of inquiring into the circumstances leading up to the appointment of the Middle West receivers. Special counsel was designated by the court and an allowance for the services of that counsel was made in the equity case and ordered paid in the bankruptcy suit. The plaintiff, on whose motion the receivers were appointed, was represented by counsel, and the receivers were represented by two firms of attorneys. Another firm participated on behalf of the estate of Edward N. Hurley, the deceased receiver. The intervener, Pollak, undertook to establish that fraud was practiced on the court in connection with the appointment of the receivers. The intervening committees and their counsel were permitted to take part in the hearing and aligned themselves in opposition to the charges of fraud. The court did not make an order authorizing them to represent either the plaintiff or the receivers. The stockholders were interested in saving the equity suit because its dismissal doubtless meant liquidation in bankruptcy and the end of the right of the stockholders to share in the estate. The noteholders' committee had joined in the attempt to take the fund from equity and have it administered in bankruptcy, but, after the bankruptcy settlement agreement, joined forces with those who sought to save the equity suit, their position at all times being determined not by a disinterested desire to save the fund for equity, but by what appeared to be to their advantage from time to time.

 Plainly the burden of defending against the charges of fraud rested on the solicitors who had filed the bill and procured the appointment of the receivers. It was likewise the duty of the receivers to assist the court in determining whether or not their title to office was tainted with fraud. The court properly permitted the attorneys for the estate of the deceased receiver to protect the interests of the estate against the consequences of a ruling that the appointment was fraudulent, and their services should be classified with those rendered by the regular attorneys for the receivers. The services of the intervening committees and their attorneys must be treated as having been rendered for their own benefit and cannot be made a charge against the general estate in the equity suit to be paid under section 77B (i).

### Resisting Bankruptcy Petition.

 The quotations from Judge Lindley's opinion above show clearly that the authorization and direction to defend the bankruptcy suit were given in order that the stockholders' committees might protect their own interests. The committee of noteholders had joined petitioning creditors in pressing the bankruptcy suit. The banks were interested with the stockholders' committee in defeating bankruptcy. It would not be equitable to allow compensation to the attorneys for the stockholders' committee for defending the suit, a service not only in their own interest but in that of the banks, and at the same time deny it to the attorneys for the noteholders who, while they were trying to destroy the equity suit, were also trying to set aside the preferences to the banks. If we view this situation as a whole and consider the claims in their relation to each other, it becomes clear that, so far as allowances in the equity suit are concerned, the attorneys must look to their clients for compensation. There is no basis in equity for compensating those services out of the general estate.

### Administrative Services.

 All of the accounts submitted for services in the equity suit contain items relating to administrative matters. Responsibility for the administration of the estate rested on the receivers and their counsel. The attorneys for the plaintiff and interveners were properly permitted to be heard on such matters, but, unless they were authorized by the court to act on behalf of the receivers, they cannot be compensated out of the general estate. They must look to their clients for compensation. In these large equity receiverships there are always many interveners who have an interest in the administrative acts of the receivers. Sometimes their attorneys make suggestions and recommendations and render services of value to the general estate. Unless, however, the court has given to them the status of its officers, they cannot be paid out of the trust fund. The consequences of any other rule are so obvious as to make further comment unnecessary. Attorneys who expect to be paid out of the general fund by order of

court should see to it that their employment is authorized by a court order.

*The Provisions in the Plan and Reorganization Decree.*

█ Whatever the effect of those provisions may be as to allowances under other parts of section 77B, they do not enlarge the authority of the equity court to make allowances which are to be paid under 77B (i). The provisions as to allowances are a part of the plan submitted in the reorganization proceedings under 77B and of the decree approving the plan. As to the equity suit, they are at most an agreement between the committees who claim to have rendered services of value to the general estate. The equity court may not make such allowances without a finding that the services were rendered in the general interest. This equitable rule is for the protection of the unrepresented members of the groups on whose behalf it is claimed the services were rendered. The representatives of different groups may not, by agreement among themselves, nor may the bankruptcy court by approval of a plan, relieve the equity judge of the duty of making the required findings before authorizing allowances payable out of the trust estate.

Allowances in the Original Bankruptcy Suit.

The attorneys for the petitioners in the original bankruptcy suit ask compensation in the reorganization proceedings for services rendered prior to the filing of the 77B petition. There was no adjudication of bankruptcy. There was no administration of an estate in bankruptcy. There was no estate of a bankrupt.

This claim does not fall, even remotely, within the provisions of section 77B (i), supra, construing the language of that section as liberally as possible in favor of the claimants. Section 64b of the Bankruptcy Act (11 U.S.C.A. § 104 (b) is equally inapplicable. That section provides: "The debts to have priority, except as herein provided, and to be paid in full out of bankrupt estates, and the order of payment shall be (1) the actual and necessary cost of preserving the estate subsequent to filing the petition; (2) the filing fees paid by creditors in involuntary cases, and, where property of the bankrupt, transferred or concealed by him either before or after the filing of the petition, shall have been recovered for the benefit of the estate of the bankrupt by the efforts and at the expense of one or more creditors, the reasonable expenses of such recovery; (3) the cost of administration, including the fees and mileage payable to witnesses as on July 1, 1898, or thereafter provided by the laws of the United States, and one reasonable attorney's fee, for the professional services actually rendered, irrespective of the number of attorneys employed, to the petitioning creditors in involuntary cases, to the bankrupt in involuntary cases while performing the duties herein prescribed, and to the bankrupt in voluntary cases, as the court may allow."

█ By that section the claims for allowances to petitioning creditors and their attorneys are made debts to be given priority of payment out of the bankrupt estate. The recovery described in subdivision 2 is a recovery for the benefit of the estate of the bankrupt, not a recovery for the benefit of the estate of a defendant in a simple contract conservation receivership based upon the allegation that the defendant is solvent. Subdivision 3 obviously can have no application unless the services result in an estate in bankruptcy out of which the debt can be paid. In re Marcuse & Co. (C.C.A.7) 11 F.(2d) 513, 515.

█ Nor does the bankruptcy court have any equitable power to make allowances for services of the claimants which are not covered by the provisions of the statutes. In re Kinnane's Co.'s Estate, (C.C.A.) 242 F. 769; In re Realty Associates Securities Corporation (C.C.A.) 69 F.(2d) 41; Callaghan v. Reconstruction Finance Corporation, supra.

█ It is argued that, if the claim is not allowable under the provisions of the bankruptcy law, it should be allowed in the equity suit and paid under section 77B (i). This argument rests upon a misconception of the federal rule as to allowances for the recovery and preservation of funds in equity. To apply the rule so as to allow in an equity suit for services rendered in a bankruptcy suit, the effect of which, if successful, would be to remove the fund from equity and turn it over to the bankruptcy court for administration, would be an unwarranted extension of the doctrine. When petitioners sought bankruptcy they took their chances. If they succeeded in producing an estate to be administered in bankruptcy, they were entitled to be paid out of the estate in accordance with the bankruptcy law. They cannot expect to

have an allowance in the equity suit which they tried to supersede by establishing the falsity of the averment of solvency upon which the equity receivership was founded. The right of these claimants to an allowance rests upon section 77B (c) (9), 11 U.S.C.A. § 207 (c) (9), and upon the provisions of the plan and decree.

Allowances in the 77B Proceeding.

*Section 77B (c) (9).*

That paragraph provides that the judge may allow reasonable compensation for services rendered and for the actual and necessary expenses incurred in connection with the proceeding and the plan by officers, parties in interest, depositaries, reorganization managers, and committees or other representatives of creditors or stockholders and the attorneys or agents of the foregoing and of the debtor.

The statute is very broad in its terms. The court is given a much wider latitude in making allowances for services and expenses than a court of equity possesses in reorganization effected through equity receiverships. The breadth of the authority conferred upon the court calls for extreme caution in its exercise. The court must have constantly in mind the purpose of the statute and apply it so that the estate will not be burdened by allowances to those who have made no real contribution to the work of reorganization and have consumed an unnecessary amount of time in arriving finally at a result which, from the standpoint of equity and fair play, should have been reached without serious dispute. Obstructionists should not be paid for time wasted in pressing claims that are unreasonable and without merit.

The statute covers services rendered and expenses incurred in connection with the plan prior to the enactment of section 77B. In re National Lock Co. (C.C.A.7) 82 F.(2d) 600; In re Tudor Gables Corporation (C.C.A.) 83 F.(2d) 871.

The statute authorizes allowances to the attorneys or representatives of creditors or stockholders who materially contribute to the rehabilitation of the debtor's estate. In re National Lock Co., supra; In re. Grocery Center, Inc. (C.C.A.) 83 F. (2d) 617.

The court must try to draw the line between services and expenses incident to the reorganization and those which are strictly in the interest of an individual or group. Many items of service or expense, while of benefit to an individual or group, promote the work of reorganization. The court must then determine to what extent the service or expense shall be charged against the general fund. In re Herz, Inc. (C.C.A.) 81 F.(2d) 511; In re 211 East Delaware Building Corporation (D.C.) 13 F.Supp. 473.

There is a limit beyond which compensation for services in connection with the plan may not be paid out of the estate. The court must consider, as a controlling element in fixing compensation, the reasonable amount of time which would have been required to effect a reorganization if that time had been diligently and prudently employed. If there are any overprolonged negotiations the court, in fixing compensation, must take that fact into consideration. There must be consideration of the relative contributions to success or results of the work of the various applicants, and there must be inquiry as to who did the work, and whose work was merely duplication. The court must try to find out who rendered the real service in the case. Hours of time spent, while an element to be considered, are not controlling, and sometimes of very little importance. In re 211 East Delaware Place Building Corporation, supra.

An applicant cannot claim more out of the general fund because he has assured his clients that he would not look to them for fees, but would look to the court for compensation. The right to compensation out of the general fund depends upon whether the services were rendered in connection with the proceeding or the plan. The court could not, if it so desired, compensate lawyers for services rendered in the interest of their clients and not authorized by the statute. If lawyers see fit to render such services gratuitously, they may not complain because the court refuses to pay for them out of the estate. In re Herz, Inc., supra.

The statute imposes upon allowances the standard of reasonableness. That term *must be interpreted and applied in the light* of the history and purpose of the statute. Callaghan .v. Reconstrucion Finance Corporation, supra; Continental Illinois Bank & Trust Co. v. Chicago, Rock Island & Pacific Railroad Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; In re New York Investors (C.C.A.) 79 F.(2d) 179.

The statement of Judge Coxe in Re Paramount-Publix Corporation (D.C.) 12 F.Supp. 823, 828, sums up correctly the applicable principle: "There are no satisfactory rules or standards which can be applied safely in fixing allowances for services in judicial proceedings, and the principles laid down by the courts with respect to attorneys' compensation generally have only a very limited application. Receivers, trustees, and their attorneys are court officials, acting under court designation, and there is no opportunity for what Chief Justice Taft called 'vicarious generosity' in determining what amounts may properly be paid to them. In re Gilbert, 276 U.S. 294, 48 S.Ct. 309, 72 L.Ed. 580. They can neither expect nor be paid more than 'moderate compensation.' In re New York Investors, supra. This is equally true with respect to committees, depositaries, and others who perform services in connection with the reorganization. They are part of the court's machinery, and should receive no different treatment than that accorded to receivers, trustees, and their attorneys. The discretion of the judge in fixing such allowances is judicial, and should be exercised sparingly."

Judge Evans in Re Insull Utility Investments, supra, points out an element which must not be overlooked in fixing the compensation of all of those who are a part of the court's machinery in these reorganization cases. He said: "The position of receiver being one of honor and trust, an officer of the court, the incumbent must recognize that a substantial part of his compensation must be found in the opportunity to serve. He has, in other words, joined the ranks of those who are public servants, whose compensation never has been and never will be as large as of those engaged in private employment. His compensation must in some ways be compared to the salary of the judge who was sitting on the bench when the appointment was made. An inquiry into the compensation of the United States District Attorney and the Postmaster is appropriate. The salary of the Chief Justice of the United States Supreme Court may well be viewed as the maximum which should be allowed."

The comment of the Supreme Court on a fee allowed to a master in chancery makes emphatic that the compensation of those called to the assistance of the court, or who look to the court to fix their compensation, must be made on a basis which bears some reasonable relation to the compensation of public officers performing services of similar difficulty and importance. The court said: "Notwithstanding protracted, painstaking, and for the most part excellent services rendered by the master and the large amounts involved in these causes, after viewing the records and considering the circumstances disclosed, we cannot doubt that the allowances are much too large—certainly twice and three times what they should be. If the time devoted to the entire service—282 days—be accepted as equivalent to one year, the total allowance is 15 times the salary of the trial judge and 8 times that received by justices of this court. It may be compared to the compensation of the mayor of New York City, $15,000, the salaries of the Governor and members of the Court of Appeals of New York, $10,000, and the $17,500 paid to judges of the Supreme Court in the city of New York. Although none of these can be taken as a rigid standard, they are to be considered when it becomes necessary to determine what shall be paid to an attorney called to assist the court. His duties are not more onerous or responsible than those often performed by judges." Newton v. Consolidated Gas Co., 259 U.S. 101, 105, 42 S.Ct. 438, 439, 66 L.Ed. 844.

*Provisions of the Plan and Decree as to Allowances.*

The plan contains the following:

"The reasonable expenses (not otherwise paid), which may be approved by the reorganization committee, of committees representing holders of securities of Middle West, and reasonable compensation of members of such committees, as approved by the reorganization committee, shall be assumed as liabilities by the new corporation.

"All costs of administration and other allowances made by the court in connection with said proceedings under said Section 77B shall be paid in cash out of the assets of Middle West."

The decree provides: "The court reserves jurisdiction for such purposes as may be required to effect and carry out the Plan, to determine and cause to be paid by said The Middle West Corporation, the administrative expenses and allowances and reasonable compensation for the services rendered, and reimbursement for the actual and reasonable expenses incurred, in and in connection with these proceedings, in

connection with said equity proceedings and the proceedings brought to adjudicate the Debtor, an involuntary bankrupt, and in connection with the Plan by officers of the court, parties in interest, depositaries, reorganization committees or other representatives of creditors or stockholders, and the attorneys or agents of any of the foregoing, and to approve or disapprove all amounts to be paid by the Debtor or by The Middle West Corporation, and all amounts to be paid to committees or reorganization committees, whether or not by the Debtor or The Middle West Corporation, for services and expenses incident to the reorganization of the Debtor (and all amounts approved for payment or reimbursement on account of such expenses, allowances, compensation, or services shall be paid by said The Middle West Corporation)."

██ Those provisions are considered by some of the applicants to mean that the court is under obligation to make allowances in the section 77B proceeding for all services rendered by committees and their counsel in the equity and old bankruptcy proceedings, whether such services were incident to the reorganization or not. The language of those provisions in the opinion of the court may not reasonably be given that construction. The provision in the plan is very indefinite. The reorganization committee was to pass upon the class of expenses to be allowed and to fix the reasonable allowances therefor. The plan says nothing about any allowances except those under section 77B. That part of the plan was not adopted by the court. The decree reserved jurisdiction, among other things, for the court to determine the expenses and compensation to be allowed in connection with this proceeding and the equity and old bankruptcy proceedings, and to cause the allowances to be paid by the new corporation. The decree expressly reserved jurisdiction of the court to approve or disapprove all amounts to be paid by the debtor or by the new corporation, and all amounts to be paid to committees or reorganization managers whether or not by the debtor or the Middle West Corporation for services and expenses incident to the reorganization of the debtor.

The provision of the decree is merely a reservation of jurisdiction, and its effect is that the judge shall determine what allowances are to be made precisely as if there were nothing in the plan about it. That means that the judge is to make the allowances as in any other case in accordance with the statute. There was no intention by the court to attempt to create authority to grant fees not covered by statute.

██ Reorganization plans, by assumption agreements as to services rendered in prior bankruptcy and equity proceedings, cannot enlarge the powers of the court under section 77B to make allowances. The purpose and plain provisions of the statute may not be circumvented in that way. The allowances in the old cases must first be approved by the court in which those cases are pending. The 77B court must then under 77B (i) determine whether or not the allowances so made are reasonable. A plan which is to be enforced against all creditors and stockholders through the consents of two-thirds of each class of creditors and a majority of each class of stockholders must comply strictly with the statute and must contain nothing which is not authorized therein. The only allowances to committees and reorganization managers authorized by the statute are those rendered in connection with the proceeding and the plan.

██ Paragraph (f) (5) of section 77B, 11 U.S.C.A. § 207 (f) (5) requires that the judge, before confirming the plan, shall be satisfied that "all amounts to be paid by the debtor or by any corporation or corporations acquiring the debtor's assets, and all amounts to be paid to committees or reorganization managers, whether or not by the debtor or any such corporation for services or expenses incident to the reorganization, have been fully disclosed and are reasonable, or are to be subject to the approval of the judge."

The specific clause as to committees and reorganization managers, following the general language which is broad enough to include the language of the specific clause, under elementary rules of statutory construction, indicates clearly that, except as authorized by section 77B (i), the judge, in a proceeding under 77B, is limited in making the allowances referred to in paragraph (f) (5) to services and expenses incident to the reorganization.

*Services and Expenses in Connection with the Proceeding and the Plan.*

██ 1. Officers and their attorneys: The grant of authority under section 77B (c)

(9) of course covers the compensation of the trustee and his attorneys and the court's special advisor. Those applications will be disposed of by separate order in this proceeding.

■ 2. Expenses: In allowing expenses the court is limited to those items which were necessary in connection with the proceeding and the plan. Items of expense incurred primarily for the benefit of a class of creditors or stockholders and contributing to the plan only indirectly and remotely cannot be allowed.

■ General office expenses incurred in preparation for court proceedings and work on the plan should not be allowed as expenses, but should be taken into consideration in making allowances for services. In determining allowances for services the court must have in mind that attorneys, unlike public officers, do not receive the full amount of the allowances. They must maintain their offices, pay the salaries of junior attorneys and clerks, keep up their library and defray the incidental expenses necessary to the practice of their profession. Those expenses usually take from one-third to one-half of the gross receipts, and allowances for services should be made accordingly. But, if that rule is applied in compensating for services, attorneys are not entitled to a double allowance for expenses already taken into consideration in connection with their services.

■ The burden is on the applicant to show that the expenses were necessary. The court is required to find that the expenses were necessarily incurred. In considering allowances for experts and kindred items, the court, in the absence of a full showing as to the necessity for the expenditure of the amount claimed, must limit the allowance to what, under the circumstances, appears to be a reasonable expenditure for the stated purpose. In this case the amount claimed for at least one of the expert witnesses appears to be beyond all reasonable limits.

■ Attorneys' fees already paid by committees will not be treated as expenses. Allowances against the general fund will be made covering the entire service of the attorneys. Those allowances are not to be taken as a finding with respect to the value of the services to the client. They are a finding only as to the amount to be charged against the general estate under the rules which are binding upon the court.

■ 3. Services in connection with the bank settlement agreement: Under the decision of the Circuit Court of Appeals for this circuit (In re National Lock Co., supra; In re Grocery Center, Inc., supra) those services are taken into consideration in fixing the allowances to the committees and their counsel and to the counsel for the petitioning creditors in the bankruptcy suit for their services in connection with the plan. That agreement was an important step toward reorganization. It was made in the course of the negotiations for the plan. It was directly connected with the plan. The services which contributed directly to the making of the agreement are compensable under section 77B (c) (9).

Eight separate groups claim to have rendered services in this connection. Judge Lindley in Lincoln Printing Co. v. Middle West Utilities Co., supra, found (page 684 of 6 F.Supp.) that the settlement was procured largely through the activities of the noteholders' committee and its counsel, and that the agreement was a valuable contribution toward reorganization.

■ 4. The Pollak intervention: That hearing and the services therein have no direct relation to the making of the reorganization plan. This subject has been considered already in connection with allowances in the equity suit. The services cannot be included among those for which compensation is allowed under section 77B (c) (9).

■ 5. The old bankruptcy suit: Services in the old bankruptcy suit by attorneys for petitioning creditors and noteholders on the one side, and attorneys for the stockholders' committees on the other, cannot be treated as services in connection with the reorganization plan. They were rendered in the interest of different groups, the unsecured creditors seeking bankruptcy because it would exclude the stockholders from participation in the plan and enable suits to be brought against the banks to recover preferences; the stockholders resisting bankruptcy for their own benefit and that of the banks. The services did not have any direct relation to the plan. They were not in connection with negotiations for the plan. They were rendered in a court controversy over the fund, each side pressing its own case. The attorneys in the proceeding did participate in negotiations for the settlement which led to the plan, and to that extent, as pointed out

above, they should receive consideration under section 77B (c) (9).

▇ 6. Administrative work: Some of the attorneys for committees did work in procuring the settlement of claims. That was a service helpful in the reorganization. One of the items to be considered in allowances under section 77B (c) (9) is the service of the attorneys for the noteholders' committee in connection with the controversies with the Mississippi Valley Utilities Investment Company.

▇ 7. Work on the plan: Sixteen of the petitioners claim to have contributed to the preparation of the plan after the filing of the section 77B petition. The court has given consideration to the contribution which each of the petitioners made to the plan as modified and approved by the court. The rules applied in placing a value upon the services of the petitioners in this respect have been stated above. One additional comment should be made. Some of the interveners represented parties whose interests were relatively small. The value of the interest represented by an attorney is one of the elements which must be considered in fixing a fee. Otherwise, every bondholder or stockholder in a proceeding might employ an attorney who would give a large amount of time to attending meetings and hearings and discussing proposed plans and claim an allowance on account of services many times more than the value of the securities represented by him.

With reference to the work in connection with the formulation of the plan, it should be said that the property to be reorganized was a large one. The assets consisted largely of securities in other companies. There were many difficult problems to solve. There were honest differences as to value. However, it must be said that the attempts of parties in interest to fix on the one hand unreasonably low values for the property and on the other excessively high values were not helpful to the court.

### Findings.

The findings in this case are limited to the expenses and services in connection with this reorganization proceeding and the plan. The applications for services performed in the equity suit will be made the subject of findings and an order in that suit, and, if allowances are made, those allowances will be ordered paid in this proceeding. Allowances to the trustee herein, his attorneys, and the court's advisor will be covered by separate order.

The court finds that the following amounts are reasonable compensation for services rendered in connection with this reorganization proceeding and the plan:

| | |
|---|---:|
| Jacobson, Merrick, Nierman & Silbert | $ 51,500.00 |
| Preferred stockholders' committee | 10,000.00 |
| Attorneys for preferred stockholders' committee | 62,500.00 |
| Common stockholders' committee | 10,000.00 |
| Attorneys for common stockholders' committee | 23,500.00 |
| Noteholders' committee | 20,000.00 |
| Attorneys for noteholders' committee | 112,500.00 |
| Mayer, Meyer, Austrian & Platt | 32,500.00 |
| White & Case | 22,500.00 |
| S. A. and L. B. Ettelson | 10,000.00 |
| Tarnapol, Flamm & Sideman | 7,500.00 |
| Frank J. Loesch and Thomas D. McKeown | 5,000.00 |
| Sullivan, Gannon, McGinn & Whitson | 7,500.00 |
| Lucey, Weil & Tell | 5,000.00 |

The court further finds that the following amounts are reimbursements for the actual and necessary expenses incurred in connection with the proceeding and plan:

| | |
|---|---:|
| Jacobson, Merrick, Nierman & Silbert | $ 3,000.00 |
| Preferred stockholders' committee | 20,000.00 |
| Common stockholders' committee | 6,000.00 |
| Noteholders' committee | 50,000.00 |
| Mayer, Meyer, Austrian & Platt | 5,000.00 |
| White & Case | 2,500.00 |
| Reorganization committee | 17,500.00 |

The foregoing are adopted by the Court as findings of fact and conclusions of law.

### On Petition for Rehearing.

Petitions for rehearing have been filed by some of those to whom allowances have been made for services and expenses in the opinion filed September 29, 1936.

The attorneys for the petitioning creditors request an additional allowance. Their clients are noteholders whose claims

amount to $47,000. Their statement of services covers 462 pages. The statement has been re-examined. The court allowed these attorneys for services an amount in excess of the face value of the claims represented by them.

The court did not overlook the services in the bankruptcy court prior to the filing of the petition under Bankr.Act § 77B, 11 U.S.C.A. § 207. The court held that compensation for those services could not be awarded under section 64b (3), 11 U.S.C.A. § 104 (b) (3), but was allowable under section 77B (c) (9), 11 U.S.C.A. § 207 (c) (9). The court adheres to that view despite In re Paramount Publix Corporation (Feldblum v. Paramount Pictures, Inc.) (C.C.A.2) 85 F.(2d) 596, decided September 16, 1936. The result is the same whether the allowance is made under the one section or the other. A double allowance for the same services should not be made. It is apparent that the treatment of this kind of service by this court has been quite liberal compared with that of the New York court, to say the least. Error, if any, is not against the claimants.

▮▮▮ The court has not intended to disparage the value of these services. The line must be drawn between services compensable out of the general fund and those for which the client should pay. The court has stated the rules of law which are applicable, and is of the opinion that those rules have been properly applied to the facts. It would be a burden too heavy to be borne to require the court to analyze a statement as long as this and to separate its items into groups. If separate accounts were intended to be rendered, that separation should have been made by the claimants. At least, there should have been some attempt to separate items compensable out of the general fund from those for which the attorneys were clearly obliged to look solely to their clients.

▮▮▮ As to services in connection with the plan both before and after the filing of the section 77B petition, the amount of claims represented by the attorneys is an element which cannot be overlooked.

▮▮▮ The attorneys for A. Homan et al. complain that the allowance to them is inadequate. They represent noteholders with claims of a face value of $26,000. They claim principal, if not exclusive, credit for the amended reorganization plan. They

estimate that they improved the condition of the general creditors to the extent of four million dollars.

The great majority of the noteholders were represented by counsel, who, apparently, were as honest and sincere in protecting the interests of their clients as were the counsel for this small group. The amended reorganization plan was the result of many factors. It represented in the end the judgment of the court which, by statute, is required to find that the plan is fair and equitable after hearing from all of those entitled to be heard.

The statute gives to every creditor the right to be heard. An attorney may not claim the right to speak for a creditor who has not authorized him so to speak, but, on the contrary, has employed some other attorney to speak for him. An attorney may not appropriate to himself the task of representing those who have selected another to represent them. He may speak for his own clients, and if what he contributes is of value his clients may be relieved, in whole or in part, from paying what otherwise they would be obliged to pay for his services. One of the elements which cannot be overlooked is the value of the service to the client. An attorney may not come into a case and spend time out of all proportion to the interests which he represents, and then ask the court to pay him many times what the client would have paid if there were no provision in the statute for an allowance from the general fund.

Speaking of section 77B (c) (9), Judge Evans, in Re 211 East Delaware Place Bldg. Corporation (D.C.) 13 F.Supp. 473, said: "This entire section is unfortunate in its wording and is the origin and support of many duplicated and excessive charges."

It is particularly unfortunate in that its language has been interpreted by a portion of the bar to permit an attorney to enter a case for a creditor or stockholder, spend an unlimited amount of time in studying the case, attending court, and working on plans, and then file a bill out of all proportion to the interest of his client, without a showing either that the client has paid the fee or is under obligation to pay it if it is not allowed by the court.

There is nothing in the statute, however, which warrants a departure from the basic rule that an attorney cannot have a

standing in a suit other than that which he obtains as a representative of clients or by designation by the court. The policy of the law should be to relieve the client from expenses actually incurred by him which have contributed to the reorganization.

The court has re-examined the statement filed by attorneys for Homan et al. A great deal of the service was in the direction of controversy on behalf of this group of noteholders—a controversy which the large majority of noteholders did not indorse. If the principles applicable to a class suit were to apply to petitions for fees under section 77B, which they do not, the expense of this controversy should be borne by the noteholders and not by the general estate. Reorganization plans are the result of compromise; and litigiousness is not to be rewarded when it passes the limits of reasonable argument on behalf of the interests represented. The value of contribution to a plan must be estimated as of the time when it was made. The court adheres to the conclusion that the allowance to the attorneys for Homan et al. amply covers the services for which compensation may be allowed out of the general fund; that is to say, the services rendered in connection with the plan as distinguished from services on behalf of a class of creditors.

Petitions for rehearing were filed by Thomas V. Sullivan and Gannon, McGinn & Whitson, attorneys for E. E. Cohn and Mandel H. Harris, noteholders, and by James H. Benjamin, who claimed to be an agent for those noteholders. The petitions were withdrawn and appeals were taken from the order of September 29, 1936.

In the order of September 29, 1936, there were no allowances to either Benjamin or to Maurice H. Klein, who filed a petition as trustee of Walter V. Fackler, an attorney. Fackler also claimed to be an attorney for Cohn and Harris. An allowance was made to Thomas V. Sullivan and to Gannon, McGinn & Whitson. In making it the court was acting in the belief that they were the attorneys who were entitled to compensation for whatever services were rendered by attorneys and representatives of Cohn and Harris.

The filing of the petitions for rehearing by Sullivan and Gannon, McGinn & Whitson and by Benjamin led to further examination of the record touching the activities of all attorneys and representatives of Cohn and Harris.

If the petitions for rehearing had not been withdrawn, the court would reopen this matter and take further testimony with reference to all of the activities of those who claimed to represent Cohn and Harris. In view of the pending appeals, however, the court withholds further comment, and will take no further action unless authorized so to do by the Circuit Court of Appeals.

The petitions for rehearing and requests for additional allowances of attorneys for the petitioning creditors and attorneys for Homan et al. are denied.